FREEMAN GODFREY AND SILAS F. GODFREY v. GEORGE H. WHITE, AMOS RATHBONE, ALFRED D. RATHBONE ET AL.

*Partnership accounting—Disposition of lands—Allowance of compensation to partners and of interest on advances.*

Lands that are part of a common partnership stock have in equity the character of personalty; and the legal title thereto is subordinated to the incidents of partnership funds and accounting.

Partnership lands cannot, in Michigan, be distinguished from other assets for purposes of settlement.

Proceedings between partners for an accounting are always for the principal purpose of reaching a statement of money balances and a division of assets as personalty, and being essentially a personal and not a real controversy, may be carried on in courts within whose jurisdiction the parties live and do business, irrespective of the location of the partnership lands.

Partners cannot ordinarily claim allowances for services exceeding those of their associates; but where those who do not expect to be personally charged with the business of the firm perform special services, it is proper to allow them compensation beyond their share of the profits if they had an understanding with the others that they were to be compensated for them.

Failure in duty as a partner may be a ground for dissolving the partnership, but not for a claim by diligent partners for compensation.

An agreement to compensate cannot be implied from the mere fact that services were rendered.

A merchant who for his own purposes sends his customers to another dealer does not thereby acquire any claim on him.

Interest cannot be allowed at ten per cent on an accounting if there has been no written agreement for that rate.

Advances by partners for the benefit of the business do not draw interest unless an intent that they shall do so can be inferred from usage or from circumstances, or unless it is understood by the partners that it shall be allowed.

In a suit for an accounting an allowance was properly made for a reasonable sum paid by complainant to a competent accountant for the purpose of arriving at an adjustment, the services being necessary and of use to all parties and therefore a common charge on them.

Partition may be made by consent; but it is not an incident to a suit for a partnership accounting in which the partners usually have a right to have the assets disposed of. If land belonging to the firm is not disposed of, it must be left as a distinct tenancy in common so that the tenants may have it partitioned in a separate suit.

Partition is a local proceeding, and can only be enforced in a court which has jurisdiction of the territory where the land is.

Deponents cannot waive the reading of their depositions before signing them; depositions so signed are inadmissible in evidence.

Where all the parties to a partnership accounting appealed and the case was so disposed of that neither prevailed rather than another, the cost of printing the record was apportioned according to the interest of the parties in the firm, and in other respects each party paid his own costs.

Appeal from the Superior Court of Grand Rapids. Submitted February 10 and 11.   Decided April 7.

BILL for partnership accounting.  Both parties appeal.

*Norris & Uhl* for complainants.   A consent decree cannot be materially varied without the assent of both parties (2 Dan. Ch. Pr. 1029 n. 10; *Leitch v. Cumpston* 4 Paige 476; *Jenkins v. Eldredge* 1 Woodb. & M. 61; *Clark v. Hall* 7 Paige 382), nor can it be set aside, *Harrison v. Rumsey* 2 Ves. 488, nor appealed from, 2 Dan. Ch. 1459; *Coster v. Clarke* 3 Edw. Ch. 405; *Atkinson v. Manks* 1 Cow. 691; *French v. Shotwell* 5 Johns. Ch. 564; *De Carters v. Lafarge* 1 Paige 574; *Monell v. Lawrence* 12

Johns. 521; partnership real estate is regarded in equity as personal property, 1 Story's Eq. Jur. § 674; 3 Kent's Com. 37; Story Partnership §§ 92-4; Pars. Partnership 207, 350; *Howard v. Priest* 5 Met. 582; *Buchan v. Sumner* 2 Barb. Ch., 165; *Delmonico v. Guillaume* 2 Sandf. Ch. 366; the mode of keeping partnership accounts in regard to real property belonging to the partners, has weight in determining whether it is partnership property, *Fairchild v. Fairchild* 64 N. Y. 477; a decree for an accounting should order a sale of partnership realty, and the distribution of the receipts, Story Partnership 207, 350; Pars. Partnership 474; *Darby v. Darby* 5 Drury 505; *Stevens v. Stevens* 39 Conn., 474; *Carter v. Bradley* 58 Ill. 101; *Levi v. Karrick* 8 Ia. 150.

*Blair, Kingsley & Kleinhans* for defendant and appellant White.

CAMPBELL, J. The bill in this cause was filed to settle the affairs of an alleged partnership wherein the complainants claim an interest of one-third, Alfred D. Rathbone one-fourth, and George H. White and Amos Rathbone the remaining five-twelfths. The other defendants have no interest in the chief controversy. The original arrangements, with slight exceptions, are not in dispute, although there is some difference of claim concerning their legal effect. The chief difference now arises out of claims for personal services of different partners, claims for interest on advances, and some special items of credits and charges. Defendant White sets up want of jurisdiction. The suit was brought in the Superior Court of Grand Rapids, and he insists the suit is local, and should have been in the circuit court for Kent county.

In the spring of 1865 an agreement was made verbally between complainant Freeman Godfrey, acting really on behalf of himself and his brother Silas, with defendants Amos Rathbone and George H. White, with a view to the acquisition of title to certain lands near Grand Rapids, valuable for gypsum beds, and then held in common

by various owners. During that year the control of the title was completely vested in White and Rathbone. It was understood that complainants should have a third interest and pay a third of the purchase money. It was further understood that Alfred Rathbone, who was then just at the close of his minority, should have a fourth interest. In 1868 conveyances were made vesting in complainants and in Alfred Rathbone record title to those amounts.

The purpose of this purchase of lands was to develop the plaster beds and get out and sell plaster in its various shapes, rough and ground. At first there was no provision made for calcining the gypsum, but after a few years this was added to the other works. Godfrey & Brother had at the beginning, and continued to have, separate plaster mills of their own, which, although claimed by White to have been connected with the common enterprise, are to be regarded as foreign to it.

From 1865 to 1871 the business was continued without any arrangement for calcining. In that year works were set up for that purpose. From that time until 1876, when this bill was filed, the business was carried on in all its branches, and extensive improvements put on the land, and large profits received. In July, 1876, the parties not agreeing, and failing to come to terms, this bill was filed, and the property was put into the hands of a receiver.

During all this interval the books were never balanced, and no accounting was ever had. A considerable part of the charges and credits in controversy never came into any recognized statement.

The absence of any written articles of partnership, and the failure to make any such entries as would bear upon the terms of the business, must be regarded as the cause of this litigation. Nearly all of the questions we are called upon to determine should have been easily settled by the partnership books, if they had been kept as they ought to have been.

The bill set forth the partnership on the terms already

referred to, carried on under the name of George H. White & Co., one object being to prevent the appearance of any common interest with Godfrey & Brother, the parties supposing an appearance of competition might help them. Complainants set out various services done by them in the business, and averred as a special ground of pecuniary allowance to them the turning over of a large amount of orders for plaster from Godfrey & Brother to the firm, for which a claim was made of $25,000, and also various other contracts with outside parties, on which similar credit was demanded. A claim was also made for personal services.

Defendants filed an answer and cross-bill admitting the common interest and business, but denying it was a partnership. These pleadings claimed that Godfrey & Brother's calcine business was to be combined with the other, and should be joined in the accounting. There were some other special allegations which need not be repeated here, but which may be referred to in another connection as far as necessary.

After issue had been joined under the cross-bill and preparations made to ascertain the truth of some facts in it, a consent decree was made on the 9th of June, 1877, for the submission to a jury of the two main questions—*first*, of a partnership; and *second*, whether it included Godfrey & Brother's calcine business.

On July 18, 1877, when these issues came on to be heard, a new decree was made by consent, dismissing the cross-bill, and directing an accounting to be had on the theory of the original bill. It was found there was such a partnership as there set up, " in which the interest of Freeman Godfrey and Silas Godfrey was and is one-third, and the interest of Amos Rathbone, Alfred D. Rathbone, and George H. White was and is two-thirds."

Subsequently, in November, 1877, the court allowed amendments of the pleadings setting up claims for personal services on both sides and interest on advances, and ordered, by way of further directions, that in the

accounting there should be a separate finding as to each of the defendants.

It is not very important, in our opinion, to consider the precise extent to which the parties or court could go beyond the terms of the consent decrees. It does not seem to us that either of the amendments was beyond the fair scope of the accounting. If the matters referred to had appeared on the books, this would be very manifest. And while, from a technical reading of the decree, it might perhaps be claimed that the firm consisted of two members—Godfrey and Brother jointly being one, and White and the Rathbones jointly the other—there can be no harm done by making an apportionment among the several defendants so far as relates to the strictly partnership business, if it will not confuse the accounts. In the present case we think this may be done to a certain extent, at least. It could not include separate interests not concerning the firm at all.

The court below in the final decree not only settled the individual interests in the assets, but required the land to be divided and partitioned in described parcels, and the remaining assets distributed in accordance with the finding of the court on the proper balances.

An important preliminary question is presented concerning the actual extent of the assets. We are called on to determine whether the real estate is partnership assets, and also whether it is to be regarded as purchased entire for the firm in the outset, or as furnished by the respective partners as their separate property, each interest being treated as several.

We have no doubt from the testimony and from the conveyances of 1868, made some three years after the business was commenced, that it was intended to consider each set of tenants-in-common as turning in their respective interests in a fixed proportion to the general business. At that time, when there was no attempt made to balance the accounts, complainants received a

conveyance of one-third, and Alfred Rathbone of one-fourth. There can be no doubt this showed them to be tenants-in-common in the strictest sense at that time, so far as the documentary title went. Whether the land was or was not to become assets for distribution, it is quite plain that each was, so far as the firm was concerned, considered as bringing in his own undivided interest as his own property. The cost of the property cannot be treated as so much money paid out of the common stock for the common interest. If any money was paid out of the firm for that purpose, each individual to whose benefit it enured thereby became indebted separately for so much advanced him on account. In taking the final accounting each is to be treated as owning in the outset a separate interest, in the purchase of which the firm was not involved as a firm. Complainants held one-third and defendants the rest, and complainants are not concerned in any dispute between defendants as to the original consideration for Alfred's quarter, or as to which of the defendants paid for it. All disputes between Alfred and the other defendants as to the state of his dealings with them, and as to the guardianship and estate accounts they were bound to settle with him as custodians of his father's estate, are outside of this controversy and must be settled elsewhere. He stands here as original owner of one-fourth of the land, and entitled to one-fourth interest in the business, chargeable with any moneys paid to or for him out of the firm assets, and creditable with all money advances made by him outside of the land, and with any other items of credit properly chargeable to the firm in his favor.

This being so, there is some force in the claim set up by White that the firm merely became tenants of the land, and interested only in its rents and profits. To this view, however, there is, we think, a fatal objection.

No written agreement having been made creating any tenancy, and no term having been fixed for the continu-

ance of the business, it would follow from any such theory that if either party became considerably indebted to the firm beyond his share in the assets, there would be no lien upon the land against him; and in case of dissolution, the tenancy would end in such a way as to leave the firm without any security. No doubt such agreements may be made, but we do not think such was the understanding. On the contrary the purpose of the arrangement was to expend money in permanent improvements on the land itself, all of which were subservient to the business of quarrying and disposing of plaster in its different forms. Money was thus expended out of the common earnings as well as advances in successive years, and no difference was made in the accounts between funds used for one purpose and those used otherwise, and nothing in the accounts would indicate that any person drawing more than his share at any time would peril the security of the rest on the land for his deficiency on a final accounting. If all these persons were really partners, as the consent decree indicates, it is impossible to suppose the lands were not understood to be part of their common stock.

This being so, the realty becomes in equity impressed with the character of personalty, and the legal title is subordinated to the incidents of partnership funds and accounting. In the present case, the fact that the parties are all living removes some complication in settlement, but it has always been the law of this State that partnership lands cannot be distinguished from other assets, for purposes of settlement. The authorities in Michigan are referred to in *Merritt v. Dickey* 38 Mich. 41, where it was held that a surviving partner was entitled to the proceeds of the sale of his deceased partner's interest in partnership lands, disposed of by an administrator, and that having bid off the interest himself, for a considerable sum, without paying the price to the administrator, bondsmen of the latter could not be held liable for the failure of the administrator to demand or

collect the bid, the remedy of the estate being against the surviving partner, as such, to compel a faithful settlement of the firm business out of the assets, all of which he was entitled to control. See also *Davies v. Games* 12 Ch. Div. 813. This doctrine becomes more especially important as bearing on the question of jurisdiction. Defendant White claims that the controversy is one concerning lands, which he insists is local under our statutes, and therefore not cognizable in the Grand Rapids Superior Court, because none of the land is in the city.

Proceedings between partners for an accounting are always for the principal purpose of reaching a statement of money balances and a division of assets as personalty. It may, no doubt, in some cases, turn out that there is enough pure personalty to settle all balances without reference to such lands as are owned by the firm, so that if parties choose they may keep the lands separate. But this cannot usually be known until the accounts are taken; and unless the lands are kept out of the accounting altogether, originally by general consent, there must be some difficulty in treating them as distinct at any time. It would be contrary to all principle to hold a court capable of maintaining jurisdiction up to the last stage of a cause, and then incapable of completing its work over any part of the property in controversy. Partnership settlements cannot very well be made piecemeal. The court that deals with them must determine all of the equities. The proceeding is in its essence a personal and not a real controversy. It could hardly be claimed that a partner could get an accounting in any State or region where lands were to be found, and proceed to a decree without personal service or appearance, and without a personal accounting. The decree when it reaches lands does it incidentally and its chief purpose is different.

By section 5058 of the Compiled Laws it is provided that if the subject-matter of the suit is local, the suit must be brought in the county in which the property in dispute is

situated; but if not local, in the county where some party resides, if either is a resident of the State.    By section 13 of the act of 1875 regulating the jurisdiction of the Superior Court of Grand Rapids, its equity powers were allowed to be exercised in close analogy to those of circuit courts.    It was declared it should have "the same jurisdiction as the circuit court for the county of Kent, in all cases in equity in which any complainant or defendant shall be a resident of the city of Grand Rapids, or in which the subject-matter of such suit shall be situated or located in said city," etc.    Laws of 1875, p. 44.

If the subject-matter of this suit could be regarded as local, and confined to the land, the suit was improperly brought in the Superior Court.    But as all the partners lived in Grand Rapids, and kept their place of business there, that court clearly had jurisdiction if the suit is not local.    We have already indicated our views on that question.    We do not think the objection to jurisdiction can be maintained.    The case of *Harris v. Fleming* 13 Ch. Div. 208, is a very recent decision, where jurisdiction was maintained in England concerning a partnership in mines in India.    While there were some other questions presented, the case was mainly put upon its character as intended to reach partnership dealings.    Such, we think, is the sensible view of this class of litigation.

The questions, therefore, which we are to determine relate entirely to the accounting, and to the disposition of the assets and balances.

The decree required a payment to each partner in money by the receiver of a sum mentioned in it, and then after ordering a sale of the personal assets, directed the proceeds to be divided ratably, according to the proportions of the several partners.    The real estate was partitioned in specified parcels.

In settling the separate accounts the firm was adjudged to owe complainants $13,871.40;   to Alfred Rathbone, $11,011.57;   to Amos Rathbone, $5412.94½;   to White,

$8783.94½. If this computation is correct, it would have been much simplified by reducing the share payable to each partner by what he would be bound to contribute towards paying these debts, which would result in requiring $1241.61 to be paid to Alfred Rathbone, $844.78 to complainants and $642.30 to be paid to White, making an aggregate of $2728.69 to be paid out of the share of Amos Rathbone. This would have simplified the division and balanced the accounts. But inasmuch as these results are complained of by all the parties, and must be changed in some respects, at least, we need not further dwell on them.

In making up the decree, the court below allowed claims for services in favor of Freeman Godfrey, Alfred Rathbone and White. Complainants are allowed for the services of Godfrey $6500. Alfred Rathbone was allowed $13,500. White was allowed $4800.

The commissioner in his accounting allowed to Godfrey $11,395.23; Alfred Rathbone, $16,933.33; and to White $3516.66. The court increased White's allowance and reduced the others.

One main question in the case arises out of these allowances. Without now going into full particulars it may be said that the record shows Godfrey's services were chiefly in planning and looking after the improvements, and giving the benefit of his own personal experience in seeing to the general course and development of the plaster business.

White attending more particularly to financial arrangements, Alfred Rathbone was book-keeper and general clerk in charge. Both White and Godfrey claim to have rendered services in building up a run of custom.

White claims that none of the firm should be paid for personal services, but insists he should be if the rest are. Godfrey claims each was to be paid for what he did, but disputes the amounts to be allowed.

This question is attended with some difficulty. In ordinary partnerships it is very clear that no partner

can claim allowance for his services, whether greater or less than those of his associates. *Heath v. Waters* 40 Mich. 457. Unless there is a distinct agreement for another rule, it is not to be doubted that what each one does for the common good is done *gratis*. When partners unite their fortunes, it can seldom be expected that each is as valuable to the firm as every other. And so long as the firm lasts no premium is given to the more useful members, and no deduction is made for incapacity or absence of any one. The venture is made to reach general results, and nothing more is contemplated. Failure in duty may be a cause of dissolution, but it is no ground of compensation to the diligent.

In the present case the partnership differs in some respects from ordinary business. The principal members, that is the Godfreys and White and Amos Rathbone, were engaged in other pursuits and did not expect to make this their personal charge. The work to be done at the mill and quarry was expected to be done by subordinates, subject to at most a very general oversight. The sale of the plaster required no more than some effort to control custom. One of the means of getting custom, as agreed upon, was that Godfrey and Brother should not be publicly known in the business at all, so that to the world at large it would seem that they had a rival business, and through that apparent rivalry the idea would be created that prices would be kept down by competition. It is plain that neither White nor either of the Godfreys was expected to spend very much time in the ordinary management of the business, and that neither of them did so. It is also evident that White was ostensibly the head of the firm, and the Godfreys did not appear in it, and naturally White would have more calls upon him than they would. Freeman Godfrey was, however, regarded as best qualified to get the works in running order, and White—for Rathbone and White—had in the outset a good deal of financial care and management. It would not have been very strange if these things had

led to an agreement to pay each for his special services. But, while the testimony contains more or less to indicate that at the end of the business such a claim was set up in apparent good faith, we cannot satisfy ourselves that any such agreement was ever made. We think the conduct of the parties fails to make it likely. It is not claimed that there was ever any agreement that these persons should perform specific services, or in what way and to what extent allowance should be made for them. It will not do to assume that any partner might, when he saw fit, use his own judgment in performing services, and then charge for it. Neither could such an agreement contemplate any salary to be continuous. It would only cover different and specific acts. We find proof that Freeman Godfrey did some work that no other member of the firm could have done. Had it been done by an architect or foreman, the price paid would have been but a reasonable percentage at best. But no charge was ever made of it, and no attempt was made at the time to keep any account of it. The same is true as to such services as White rendered. Neither of them ever consulted the rest as to whether such work should be regarded as subject to compensation, and neither of them ever kept any data which would enable any one to tell what it was worth. It does not appear clearly, if at all, that what they did for the firm interfered with their outside business. We do not think any such allowances should have been made.

Alfred Rathbone's case is different. There is very little doubt that there was an original understanding, although a vague one, that he was to be steadily employed, and be paid. He was actually so employed, and in the absence of written evidence, the continuous course of business is important in explaining the understanding of the parties. He had no such peculiar knowledge of the business as to show that his personal skill or judgment entered into the reckoning. Upon these matters White and Godfrey were more useful. The duties which

Alfred performed were not such as a partner would have been expected to perform as such, rather than any other person.    He was employed, in fact, as no more than a general clerk, and in the absence of any other agree-- ment it cannot be supposed he was to have, beyond his share in the profits, any more than a clerk's wages, which would have been paid to some one else if he had, like the other partners, attended to his own outside affairs. It appears that in their attempt at a settlement before this bill was filed an agreement was provisionally made as to the value of his services, fixing them at $800 a year for the first two years, and $1000 a year thereafter. We have some doubt whether he earned $800 a year at first.    But making due allowance for the delays in start- ing, we think ten years may be regarded as the period of his labor of any value, and that he should be allowed $9600, and no more.    There is no satisfactory evidence that this is not full pay for such services as he rendered different from those of the other partners.    The court below, we think, allowed too much to Alfred Rathbone, and should have made no allowance for services to the others.

Complainants were allowed by the commissioner but disallowed by the final decree, large items for orders for plaster and plaster contracts which they turned over to the firm instead of filling themselves.    These they insist were valuable and profitable, and therefore entitling them to remuneration.

Of their value there is no doubt, and they would have been a good consideration for an agreement to make some compensation.    We do not find, however, that any understanding was had to that effect, and we think none can be implied from the mere fact that the services were rendered.    There are several things in the case that indi- cate that without proof of a very clear understanding to that effect, it would be unreasonable to suppose any compensation would be regarded as allowable.    A certain mystery was kept up concerning Godfrey and Brother's

connection with the partnership, and business was divided with the evident purpose of keeping up the mystification. There was also as appears from some testimony a fear or jealousy entertained occasionally lest one firm might undersell the other without conciliation. To persons not themselves interested it is not easy to appreciate the hidden purposes which actuated all these parties in their dealings. But a merchant who sends his own customers for a specific purpose to a neighbor, does not thereby get any claim on him.

A claim is made on behalf of White and Amos Rathbone for interest on advances made in 1865, 1866 and 1867 beyond their share in the business. Some items cover still later years, but the sums are less important. The commissioner disallowed the interest. White only excepted on this account. Amos Rathbone excepted on some other questions, but not on this. The exceptions rest on two claims—one for interest at ten per cent, and one for interest generally. Both were disallowed by the Superior Court.

There was no written agreement, and therefore no foundation for any allowance of ten per cent. It is claimed that at the abortive attempt at settlement in 1876 a computation was made at this rate, and received sufficient recognition to make it equivalent to an agreement in writing. Giving that transaction all the force that can be claimed for it, it was never agreed upon as a binding account, and was at most but one of the things considered and passed by without a conclusion. But we do not think there is enough in the case to show that on that occasion there was any understanding whatever concerning the allowance of interest. Some figuring was done, which would have been considered with the other matters if the parties had finally settled. But White himself was active in avoiding a complete arrangement, and nothing done on that occasion amounts to any more than a circumstance bearing with more or less weight on the understanding of the parties. We do not think it

43 MICH.—24.

appears that the items of account were at that time so scrutinized as to throw any light on this question.

The allowance of seven per cent would be the proper one, if any allowance at all is made. If any considerable advances were made with the expectation of interest, there could be nothing out the way in having such an understanding. But while there are some circumstances which might make it apparently just to allow interest, we are not satisfied, upon a consideration of the whole case, that any error was committed by the court or commissioner in rejecting it.

It is not claimed, and it is not shown that there was any understanding on the subject when these advances were made. When there is no agreement on the subject, it seems pretty well settled that there must be something in the usages of business, or something in the surroundings of the parties, from which such an intent would naturally be inferred. It would be contrary to equity to lay such a charge on partners, unless they either knew, or ought to have known that it was to be enforced against them. They may not wish to become such borrowers. While interest is incident to a very large class of transactions, it is only chargeable, in very many of them, by way of damages after the debtor is in default for not paying his creditor. The very large amount of money deposited subject to check in our banks represents a quantity of capital which sometimes equals or exceeds the active investments in the same communities for longer or shorter periods. Very few banks allow any interest on deposits subject to call. The same thing is true in regard to a great many dealings in commercial ventures. And the rule which requires something beyond the mere advance by a partner to entitle him to interest is not unreasonable.

The fact that Amos Rathbone, who is equally interested with White, makes no such claim is entitled to some weight in construing the dealings of the partners. But aside from this, the course of book-keeping is not

consistent with it. As already suggested, the large advances were made early. Whether the business was or was not at that time in condition to reimburse them, a period soon arrived when there could have been no such difficulty. It could hardly be assumed that the firm would care to retain a large debt on interest either at seven or ten per cent indefinitely. No attempt was ever made to determine on what sum interest ought to be charged, and no interest account was ever charged or made up. No trace of such a claim is found. If there had been any basis for such a claim, it ought certainly to have been placed where the firm would know it was set up, and could admit or contest it in time to save loss and complication.

The record and the argument on White's behalf give us no satisfactory means of knowing the proper extent of such a claim if valid. The balances as finally struck have rendered an awkward method of accounting harmless, but it seems to us that if the accounts had been correctly drawn out to begin with, this question would appear differently. The charges made by Rathbone & White evidently treat the money paid for the land and not the land itself as the original capital. Many of the payments on which interest is claimed were purchase money payments. We do not see from the record that Godfrey and Brother did not pay at one time or another, the price of their one-third interest. Whether Alfred Rathbone has fully paid for his, concerns the private dealings of the defendants and not the firm. Leaving the land payments out of the question the amount of advances becomes much diminished, and much less likely to have been deemed entitled to interest. But, whatever the amount may have been, the case does not show that any one expected it would be regarded as a loan to the firm for any period, or at any rate of interest. Until some such idea was suggested, or some such claim asserted, it was not incumbent on complainants or Alfred Rathbone to suppose the advances were made except to

suit Rathbone & White's convenience.  They never asked
to have the money refunded, and they never made inter-
est claims, and they do not bring themselves within any
doctrine which would put the other partners in the wrong
for objecting to the allowance of interest.

White also complains because he was charged indi-
vidually with a purchase of plaster which he paid for
out of firm money, amounting to $1429.   We think this
was clearly shown to have been a private speculation.
And upon a few other items brought out on the argu-
ment, but not very earnestly urged, we are not disposed
to disturb the conclusions, which we think were warranted
by the testimony.

An item disallowed by the Superior Court for $125
paid by complainants to Mr. Goldsbury for examin-
ing the books and getting balances should we think
have been allowed.   This was done in 1875 and the
beginning of 1876 partly in concert with Alfred Rath-
bone.   It is evident that from the manner in which the
books were kept—although no doubt fairly kept—there
was a good deal of difficulty in knowing just how matters
stood.   The balances had not been made up at all in the
usual business way for about nine years.   It was perfectly
reasonable that any partner should desire an adjustment,
and it was also reasonable that complainants should have
some voice in procuring a competent accountant to do
it.   The work was done openly and not clandestinely,
and the assistance of Alfred Rathbone was asked and
given, and the results were of utility to all the firm.
The preparation was necessary, and some one else would
have been employed to do it if Goldsbury had not been.
If not, we think some confusion would have been cre-
ated.   We think the expenditure may justly be consid-
ered as a common charge.

We do not think it necessary to change the decree
upon amounts and balances except as indicated hereto-
fore.

But we do not think the decree for partition can be sus-

tained. If all the parties had consented to it, the decree might not be objectionable, because partition can be made by consent. But partition is not an incident to a suit for accounting, and the partners have a right usually to have the assets disposed of, if they choose. If not disposed of, all that could be done would be to leave the land as a distinct tenancy in common, so that the tenants could have it partitioned in a separate suit if they should see fit. It is difficult to maintain a partition in such a case as this, unless on the theory that the court having an equitable jurisdiction to give partition generally, it may be done to avoid circuity of action.

Supposing such a practice permissible, upon which we need not decide, the Superior Court of Grand Rapids has no separate and original jurisdiction in partition outside of the city. Partition is unquestionably a local proceeding, and the circuit court is the only court of equity able to enforce it.

The land should be sold and the proceeds divided.

There is one matter to which we feel constrained to refer with surprise. Several witnesses, and among them several of the parties, are stated by the commissioner to have waived the reading of their depositions before signing them. The integrity of these gentlemen is not denied, and both commissioner and counsel seem to have supposed the practice correct. Except for the failure of any one to move to suppress, all this testimony must have been rejected. It is in no sense sworn testimony, any more than if they had signed affidavits in blank. It is merely the certificate of the commissioner that so far as he remembers, they swore as he has certified. Where it appears on the face of a deposition that the party signing it does not know its contents, it exhibits a degree of carelessness in regard to the solemn obligation of an oath which has been, with how much truth we do not know, attributed to custom-house oaths, but which we never saw before, and hope never to see again in the course of justice.

The reductions in the allowances will take from complainants $5875; from White $4800, and from Alfred Rathbone $3900.

This will leave their respective claims against the firm as follows: Complainants $7996.40; Amos Rathbone $5412.94; White $3983.94; Alfred Rathbone $7111.57.

The Superior Court, in order to avoid confusion, reduced the cash payments to each partner on his indebtedness against the firm by deducting $24,000 from the aggregate as made up, and scaling down each share by its ratable proportion. The decree thus distributed actually about $15,000 on debts before dividing the balance. Under the present reduction a similar scaling may be made by deducting $1000 for each twelfth share, so that complainants will be paid in cash in the first instance by the receiver $3996.40; Amos Rathbone $2912.94; White $1483.94; and Alfred Rathbone $4111.57.

The decree must therefore be modified so as to require the payment of these sums in the first instance, and the distribution of the remaining assets must be made as soon as practicable in the proportion of each partner's interest in the firm. The lands must be sold by the receiver at public auction on a notice of not less than six weeks in a Grand Rapids newspaper, and the sale must be in parcels, according to the same division attempted to be made by the original decree by partition. Any partner bidding may pay for land struck off to him by allowing on the purchase so much of the proceeds of the aggregate sales as would fall to him on distribution.

As the changes in the decree operate so as to make it impossible to say that one appellant had prevailed rather than another, the costs of printing the record will be apportioned according to the interests of the partners in the firm, each party in other respects to pay his own costs.

The decree will be modified accordingly.

The other Justices concurred.