KENTUCKY BLOCK CANNEL COAL CO. et al. v. SEWELL et al.

(Circuit Court of Appeals, Sixth Circuit. March 5, 1918.)

No. 3074.

1. EVIDENCE ☞596(3)—WEIGHT—PAROL—PURPOSE OF DEED.

A deed absolute on its face cannot be shown to be otherwise by anything less than explicit testimony.

2. ACKNOWLEDGMENT ☞56—IMPEACHMENT OF CERTIFICATE.

A certificate of acknowledgment can be impugned by nothing less than fraud or duress.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. PARTNERSHIP ☞68(1)—LANDS—CONVEYANCE TO FIRM.

A deed to real estate, executed to a partnership in its firm name, vests the title in the partners as tenants in common, and in the absence of indebtedness the partners may divide the land, or convey their respective interests, and this, although the firm name consists of the surname of one of the partners, with the addition of "and company."

4. MINES AND MINERALS ☞49—ADVERSE POSSESSION—POSSESSION OF SURFACE.

Where the ownership of minerals underlying land has been separated from that of the surface, possession of the latter does not necessarily carry with it possession of the minerals.

5. MINES AND MINERALS ☞49—ADVERSE POSSESSION—MINERALS IN PLACE.

The mining of coal by a grantee of the surface of the land, although for such time as to give him title to the coal in place by adverse possession, did not give him title to oil and gas deposits not then known to exist, as against a prior grantee of the mineral rights in the land.

6. EQUITY ☞72(1)—LACHES—RULE OF FEDERAL COURTS.

In the federal courts the defense of laches is an equitable one, and, to prevail, the lapse of time and the relation of the defendants to the rights must be such that it would be inequitable to permit plaintiffs to assert their rights.

Appeal from the District Court of the United States for the Eastern District of Kentucky; Andrew M. J. Cochran, Judge.

Suit in equity by J. W. Sewell, A. W. Sewell, and Hattie F. Sewell against the Kentucky Block Cannel Coal Company and others. Decree for complainants, and defendants appeal. Modified and affirmed.

S. Monroe Nickell, of Hazard, Ky., Finley Fogg, of Paintsville, Ky., and James Garnett and A. C. Van Winkle, both of Louisville, Ky., for appellants.

O'Rear & Williams, of Frankfort, Ky., Myers & Howard, of Covington, Ky., and McGuire & McGuire, of Jackson, Ky., for appellees.

Before KNAPPEN, MACK, and DENISON, Circuit Judges.

KNAPPEN, Circuit Judge. Appellees, hereinafter called plaintiffs, filed bill in equity to quiet their alleged title to the minerals (coal, oil, and gas) in a tract of land in Morgan county, Ky., lying on both sides of the Stone Coal or Prater fork of Caney creek. They base their claim of title upon a formal conveyance of such mineral rights, made in 1865 by John Sebastian to J. W. Sewell & Co., which was a partnership composed of John W. Sewell and Harriet Sewell—father and mother, respectively, of plaintiffs, whose rights descended in equal shares to plaintiffs, their children and heirs at law. Defendants claim the property in separate parcels, tracing their alleged title to a devise by Sebastian, subsequent to his conveyance to Sewell & Co., of the fee simple in the lands to his two sons, subject only to the widow's life estate. They make defenses (1) that the alleged conveyance of the mineral rights by Sebastian to Sewell & Co. was intended to be, and was in legal effect, merely a mining lease upon future payment of royalties; (2) that the conveyance, if effective as such, passed the legal title to John W. Sewell only; (3) that the latter sold and conveyed the mineral rights in question to Mary F. Gregory, whose claimed

rights are vested in one of the defendants; (4) that defendants' title, as against plaintiffs, has been finally and effectually adjudicated in a suit in a state court of Kentucky, to which plaintiffs were parties; (5) that plaintiffs' rights, if they ever had any, have been lost by adverse possession and laches. On hearing upon pleadings and proofs, the District Court concluded that the alleged deed of the mineral rights from Sebastian to Sewell & Co. was a valid and effectual conveyance thereof; that the title thereto was thereby vested in John W. Sewell and Harriet Sewell, as tenants in common; that John W. Sewell conveyed his rights to Mary F. Gregory, but that the latter subsequently reconveyed them to Sewell (Harriet Sewell never made conveyance); that the adjudication had in the state court was binding on but one of the appellees; that the defenses of laches and adverse possession had been established only as to the mineral rights in so much of the land as lies on the eastern or·left-hand side of the fork, and as to the coal in the Asa Carter tract, so called, on the western or right-hand side. Each of the two appellees was accordingly decreed the owner of an undivided one-third of the minerals underlying the land on the western side of the fork, excepting therefrom the coal in the Asa Carter tract. Plaintiffs have not appealed.

[1, 2] 1. We agree with the District Judge that the conveyance from Sebastian to Sewell & Co. must be accepted as intended to convey absolutely the entire mineral rights in the lands in question. It is by its express terms and in clear and unambiguous language, a warranty deed, "for a true and valuable consideration to us paid," of "the entire oil and mineral privileges" in the land described. It was made at the grantor's house. It purports to be witnessed by Sebastian's son-in-law, and by the deputy clerk of the county, and to have been acknowledged before that officer. It was duly recorded as a deed on the day of its execution. It is persuasively established that the deputy clerk was present at the execution, together with John W. Sewell and one Amyx (who was assisting Sewell in buying land and mineral rights, as well as taking leases), as was also the son-in-law referred to.

At the time of the hearing Sewell, Amyx and the deputy clerk were all dead, as were also Sebastian and his wife. While there was testimony that the instrument was spoken of as a lease, and testimony tending to show that it was intended only as such, there was substantial testimony tending to the contrary conclusion, including the facts, as testified to, that Sewell then and there paid to Sebastian $25 in money, which cannot be said to have been regarded as wholly disproportionate to the then value of the minerals, having in mind their remoteness from transportation lines and the price recently paid by Sebastian for the fee simple of a portion of the land—together with other pertinent considerations, including the fact that the Sewells, one or both, during the five months period including the date of the deed in question, had taken in that district not only several deeds of lands in fee and several mining leases, but also 14 deeds outright of mineral interests. Sebastian's subsequent devise of the fee simple of the lands is not highly significant, especially as he still held the surface rights, and not improbably the mineral rights were regarded by

him as not very important. See in this connection Pond Creek Coal Co. v. Hatfield (C. C. A. 6) 239 Fed. 622, 630, 152 C. C. A. 456. It would serve no useful purpose to discuss the testimony in detail. Such discussion may be found in the opinion of the District Judge, before whom the testimony of several of the more important witnesses was taken, and who closes a detailed discussion of the testimony, with the statement that there is "no evidence of any weight sustaining the position that the agreement pursuant to which the grant in question was executed was for a lease and not a deed." A deed absolute on its face cannot be shown to be otherwise by anything less than explicit testimony, and a certificate of acknowledgment may be impugned by nothing short of fraud or duress. Johnson v. Van Velsor, 43 Mich. 208, 5 N. W. 265. Neither fraud nor duress were established.

[3] 2. Defendants say, in brief, that "from the evidence it appears that the firm of John W. Sewell & Co. [of course, meaning J. W. Sewell & Co.] was composed of John W. Sewell and Harriet M. Sewell, his wife." We agree with the conclusion of the learned District Judge, that the deed to J. W. Sewell & Co. vested the legal title in the partners as tenants in common. A deed to a copartnership in its firm name is not for that reason void. The modern authorities are practically uniform to the effect that a conveyance to a firm in its firm name passes to some one the legal title to the land as real estate. Partnership real estate is now regarded in equity as personalty only for the purpose of subjecting it to the payment of debts and adjustment of balances between partners (Riddle v. Whitehill, 135 U. S. 635, 10 Sup. Ct. 924, 34 L. Ed. 282; Stearns Coal & Lumber Co. v. Van Winkle [C. C. A. 6] 221 Fed. 590, 596, 137 C. C. A. 314); and in the absence of debts the partners have a right to personally divide the lands between them as real estate (Godfrey v. White, 43 Mich. 171, 179, 5 N. W. 243; Lovewell v. Schoolfield [C. C. A. 6] 217 Fed. 689, 703, 133 C. C. A. 449), or to convey their respective interests therein, subject to its being needed to pay creditors or adjust balances between partners (Taylor v. McLaughlin, 120 Ga. 703, 707, 48 S. E. 203). The Court of Appeals of Kentucky has more than once declared this rule. In Wilhite's Adm'r v. Boulware, 88 Ky. 169, 171, 10 S. W. 629, 630, it is said:

"The principle is universally recognized that at law real estate owned by a partnership, even if purchased in the name of the partnership, and with partnership funds, is held by the members of the firm as tenants in common."

And in Carter v. Flexner, 92 Ky. 400, 405, 17 S. W. 851, 853, the court said:

"The true rule, and the only one, that reconciles the conflicting views on this question, is that, where partners own real estate as such, it cannot be treated or considered as personalty, except for the purposes of the partnership, and then as assets for the payment of firm debts. It cannot be sold by one member of the firm in the firm name, but all the partners must unite in the conveyance."

Had the conveyance been to Sewell & Sewell, each would have taken legal title to one-half the property. Menage v. Burke, 43 Minn. 211, 45 N. W. 155, 19 Am. St. Rep. 235; Dwyer Co. v. Whiteman, 92

Minn. 55, 99 N. W. 362; Morse v. Carpenter, 19 Vt. 613. Defendants do not dispute this proposition. It is also established, at least by the better weight of authority, that a conveyance to a firm, consisting of a surname followed by the words "and Brother" or "and Son," passes the legal title as tenants in common to those conforming to such designation and shown to be actually members of the firm. In Hoffman v. Porter, 2 Brock. 156, Fed. Cas. No. 6,577, 12 Fed. Cas. 304, Chief Justice Marshall, sitting at the circuit, in an action for damages for breach of covenants in a deed to "Peter Hoffman & Son," held that the deed passed a present estate to the "Son," when identified as the one who was a member of the firm. In Carter v. Flexner, supra, this principle was at least impliedly recognized—the name of the firm, the heirs of one of whose deceased members were held to take his half interest, being "Carter & Brother." In Galbraith v. Gedge, 16 B. Mon. (55 Ky.) 631, the firm consisted of four members, under the style of Gedge & Bros. The share of the deceased partner in lands was held to descend to his heirs as real estate.

Defendants contend, however, that where the firm name contains the surname of one or more, but not of all, the partners, followed by the words "and Company," a conveyance of real estate to the partnership in such firm name vests the legal title in the partner or partners whose surnames so appear, in trust for the firm. Several cases declare this distinction. Among them are Percifull v. Platt, 36 Ark. 456, 464; Winter v. Stock, 29 Cal. 407, 89 Am. Dec. 57; Arthur v. Weston, 22 Mo. 378; Holmes v. Jarrett, 7 Heisk. (54 Tenn.) 506. The basis on which decisions of this nature rest seems to be that the word "Company" contains no certain designation of any other person than the one whose surname is given. We are unable, however, to see any logical distinction between the case where the surnames only are given, or where one surname is followed by the words "and Son" or "and Brother," and a firm name consisting of one surname, followed by the words "and Company." In neither case is there a certain designation of all the members. In either of the first-mentioned cases there is an ambiguity to be solved by parol testimony, not only as to the full name of the partner whose surname alone appears, but also as to the identity of the specific "Brother" or "Son"; and the difference between supplying by parol the partners' names in those cases and in that where it is represented by the words "and Company" is wholly unsubstantial. The language of Morse v. Carpenter, supra, in holding valid, in a suit in ejectment, a deed to a partnership, whose firm name consisted only of the surnames of the plaintiff members, is equally pertinent here:

"There is, however, an important difference between a description which is inherently uncertain and indeterminate, and one which is merely imperfect, and capable, on that account, of different applications. To correct the one is, in effect, to add new terms to the instrument; while to complete the other is only to ascertain and fix the application of terms already contained in it."

The authorities do not uniformly observe the distinction urged. In Seymour v. Western R. R. Co., 106 U. S. 320, 1 Sup. Ct. 123, 27

L. Ed. 103, it was held, citing Hoffman v. Porter, supra, that in an action on a covenant with a partnership trading in the name of S. Seymour & Co. all the partners must join. In Walker v. Miller, 139 N. C. 448, 52 S. E. 125, 1 L. R. A. (N. S.) 157, 111 Am. St. Rep. 805, 4 Ann. Cas. 601, a conveyance of real estate to James Webb, Jr., & Bro. was held to be valid, although both James Webb and his brother were dead; the persons beneficially interested continuing to do business in the old firm name. In Brunson v. Morgan, 76 Ala. 593, it was held that a conveyance of the partnership realty by Stoudenmeier, of the firm of Stoudenmeier & Co., in fact composed of three members, carried only his one-third interest. The court said:

"The deed to Stoudenmeier & Co. vested the legal title in the several members of the firm as tenants in common, and not in the name of the partnership as such. Its legal effect was the same as if the deed had been made to the three partners in their individual names."

We think this the logical view. It is clear, to our minds, that the Supreme Court, by its treatment in Riddle v. Whitehill, supra, of the Arkansas decision in Percifull v. Platt, did not intend to commit itself to the doctrine of that case, unless to the extent that the decision of the Arkansas courts as to the title to lands in that state was binding on the federal courts. Stearns Co. v. Van Winkle (C. C. A. 6) 221 Fed. 590, 593, 137 C. C. A. 314; Ingersoll v. Crocker (C. C. A. 6) 228 Fed. 844, 847, 143 C. C. A. 242. Indeed, the question where the legal title rested was not necessarily involved in the decision in Riddle v. Whitehill. It may be that the Kentucky Court of Appeals, by the decisions already referred to (and by those cited in the margin [1]), intended definitely to adopt the rule which we have characterized as the logical one, but we prefer not to rest our opinion upon that ground.

3. December 25, 1871, John W. Sewell conveyed to Mary F. Gregory all his right, title, and interest "in any lands, oil, or mineral rights" in certain enumerated counties in Kentucky, including Morgan. Plaintiffs contend that this deed, considering all its various provisions, was not intended to convey the interests in question. We agree, however, with the District Judge, that it was so intended. This intention is to our minds made especially clear—first, by the fact that, although by an earlier clause of the deed Sewell is made to convey lands for the most part, at least, belonging to others, under powers of attorney, therefor, yet, following the attestation clause, Sewell and his wife (she did not sign) in terms "quitclaim to the party of the second part all land, mineral, or oil privileges that they may own or possess in the several counties above named"; and, second, by the deed from Mary F. Gregory to Hughs, hereinafter mentioned.

Unless, then, these interests were reconveyed by Mary F. Gregory to Sewell, his one-half interest therein was lost to plaintiffs. On February 15, 1872, and less than two months after the conveyance to Mrs. Gregory, the latter made a conveyance to Sewell reciting his previous conveyance to her. The question is whether this latter instrument

[1] Lowe v. Lowe, 13 Bush (Ky.) 688; Flanagan v. Shuck, 82 Ky. 617.

reconveyed the rights here in question. Plaintiffs admit that "on the face of this deed much doubt is raised as to what it conveys.". Judge Cochran recognized that the deed was ambiguous. He, however, thought it no more so than the deed from Mrs. Gregory to Sewell, and expressed the opinion that "either the deed from Sewell to Gregory did not cover them [the mineral rights] or the deed from Gregory to Sewell did." The learned judge concluded that "in either contingency the title to one-half the minerals was left to" Sewell.

Upon a careful consideration of the record, we are unable to agree with this ultimate conclusion. The District Judge rested his conclusion of an intent to reconvey to Sewell the mineral rights in question upon a declaration in the deed last referred to that the party of the first part does "grant and convey to the said party of the second part, his heirs and assigns, such lands, hereditaments or possessions in her vested situated in the county of Morgan and state of Kentucky." This statement, however, is immediately followed by a recital of the conveyance by Sewell to Gregory on December 25, 1871, of a large quantity of lands in Morgan and several other counties, the recital of the possible arising of a question as to the intent of Sewell in making that conveyance, and a declaration that the deed was intended to quitclaim to Sewell the title to all lands patented or granted by the commonwealth of Kentucky to either of the Sewells, and conveyed by them to Mrs. Gregory by the deed mentioned. The deed also contained a release of several tracts by numbers, as well as several other tracts by name. The lands in question are not included in the deed, unless in the general clause first quoted.

While this deed, standing alone, would perhaps make it more probable than otherwise that Mrs. Gregory intended by it to convey to Sewell the minerals in question, there is one consideration (not referred to in the opinions of the District Judge) which to our minds makes it highly improbable that either Mrs. Gregory or Sewell understood the deed to have such effect: On the 9th day of March, 1872, Mrs. Gregory conveyed to John Hughs, for a stated consideration of $480, the specific lands in question (and such lands only), not only by courses, metes, and bounds, but expressly identified as being the lands conveyed by Sebastian and wife to Sewell January 23, 1865, with reference to the place of record, "and the same as conveyed by J. W. Sewell et ux. to M. F. Gregory, deed dated 25th of December, 1871, and recorded" as specified. It seems to us incomprehensible that Mrs. Gregory, who was a member of the Sewell family, should have made this conveyance to Hughs less than a month after her conveyance to Sewell, if the conveyance to Sewell was intended to reconvey, or to continue to stand as a reconveyance of, the interests in question to him. It is, to say the least, highly probable that the conveyance to Hughs would not have been made without Sewell's knowledge and approval. Mrs. Gregory's explanation is that she has no recollection of ever making any deed to Hughs, and that the reason for her reconveyance to Sewell was that the deed was given to her as security for a loan of a few hundred dollars, which was repaid. But this explanation, given by deposition out of court more than 40 years

after the conveyance, is not convincing, when considered in connection with all the other evidence in the case, including the fact that Hughs in 1875 conveyed the interests in question, which by mesne conveyances have passed to one not a party here. We think plaintiffs have not sustained the burden of proof of showing a reconveyance of the interests in question to Sewell, and thus that appellees acquired by inheritance the one-half interest only belonging to their mother, Harriet Sewell, therein.

[4] 4. *Adverse Possession and Laches.* Section 2505 of the Kentucky Statutes prescribes a limitation of 15 years in actions for the recovery of real property. The section applies to actions for the recovery of mineral rights. Pond Creek Coal Co. v. Hatfield, supra, 239 Fed. 626, 152 C. C. A. 456. We are here concerned only with those rights (coal, oil, and gas) in the lands on the west side of the fork (aside from the Carter tract) and in the minerals other than coal in the Carter tract. The assertion of title, by adverse possession, to the minerals in lands other than the Carter tract, is but feebly made, if at all. We think it clear that such right is not established. The ownership of the minerals having been severed from the ownership of the surface, the possession of the latter did not necessarily carry with it possession of the minerals. The statute thus did not begin to run against plaintiffs' title to the minerals until adverse possession thereof by defendants (Ray v. Sweeney, 14 Bush [Ky.] 1, 29 Am. Rep. 388); and the bar would not be complete unless the adverse possession was continued for the full statutory period (Wickliffe v. Ensor, 9 B. Mon. [Ky.] 253; Pond Creek Coal Co. v. Hatfield, supra, 239 Fed. 627, 152 C. C. A. 456). The Sebastians parted with the Carter tract in 1875, only 10 years after plaintiffs' title accrued. As to the remainder of the Sebastian tract, it is not established, if, indeed, it is claimed, that there was ever any mining of coal thereon for domestic purposes. There was no commercial mining of coal on any part of the tract before 1901, and no oil mining before 1912; although Sebastian appears to have given in 1889 a 10-year oil lease, we are cited to no evidence of operation thereunder, and this suit was begun in 1913. We content ourselves with saying that we find no persuasive evidence of open, notorious, continuous, and hostile possession for the statutory period of plaintiffs' mineral rights outside of the Carter tract.

[5] As to the latter tract the situation is not the same. There was more or less mining for coal thereon both before and after 1875, not only for domestic purposes, but to some extent for purposes of sale, and leases for coal mining were given as early as 1888 and some prospecting done thereunder. The District Court has found such adverse possession of coal in place as to bar plaintiffs' title thereto, and his conclusion is not appealed from. We think the record such as fairly to require us to accept it as correct, apart from the effect of plaintiffs' failure to appeal. There is, however, no proof of actual adverse possession for the statutory period of the oil and gas. Indeed, it is asserted in defendants' brief that, "until about 1906, the only mineral that was known or supposed to exist upon this land was

the coal"; appellants' contention is that, as Carter and his predecessors in title were in possession of the land under color of title, claiming it and all interests therein, general and adverse possession for the statutory period of a mineral known to exist, viz. the coal, cut off the real owner's title to all other mineral interests, although not known to exist. But this contention, we think, loses sight of the fact that adverse possession must, in order to divest title, be so open and notorious as to afford to the owner of the right affected actual or constructive notice of such adverse claim. Were the respective minerals held by different owners, the title of the oil and gas owner thereto surely would not be cut off by an adverse possession of the coal interests; and it can, to our minds, make no difference in principle that the rights to the various minerals are held by one person and under one title, for an assertion of a claimed right to mine coal by no means necessarily carried with it an assertion of right to bore for oil and gas, especially in view of the radically different means employed in mining coal and in boring for oil and gas. The method employed in recovering coal is not an open assertion of a right to bore for oil or gas. Interests in these different minerals are not so generally held together as to justify a presumption of that nature. This record is replete with claims of interests in coal and of interests in oil and gas —wholly separate and distinct from each other.

[6] As to laches: In suits in equity in the federal courts relief is not barred by lapse of time, except as it amounts to laches or works an estoppel; and while, for the sake of uniformity, the federal courts accept state statutes of limitation whenever by so doing they are not required to abrogate their own principles, the ultimate question is whether, under all the circumstances of the particular case, the plaintiff is chargeable with want of due diligence in failing to institute proceedings before he did. The defense being an equitable one, the lapse of time and the relations of the defendants to the rights must be such that it would be inequitable to permit plaintiffs to assert their rights. Estep v. Kentland Coal, etc., Co. (C. C. A. 6) 239 Fed. 622, 627, 152 C. C. A. 451; Pond Creek Coal Co. v. Hatfield, supra, where the subject of laches was considered and discussed.

We agree with the conclusion of the District Judge that the defense of laches has not been established. The delay has been great, but in view of the well-known fact that there was until within comparatively few years no general or substantial development of mineral lands situated as were these in question, that commercial mining of coal was not begun there before 1901, nor boring for oil and gas before 1912, that plaintiffs did not live in the neighborhood, and that their testimony (presumably believed by the District Judge, who heard it) was that they had no knowledge of such development until about a year before this suit was begun, we cannot say that they are chargeable with such want of diligence in failing to earlier institute proceedings as to equitably deprive them of relief. The fact that they paid no taxes on their mineral rights, in the absence of a policy of separate assessment and taxation, is not alone enough to bar them.

5. The assignment addressed to the holding that the alleged ad-

judication of defendants' title by the decree of the Kentucky state court was binding on but one of the plaintiffs is not presented or argued in appellants' brief. It is enough to say that, regardless of any question of waiver, reference to the record, including the opinion of the District Judge, suggests no error in this respect. The same considerations apply to the defense of champerty asserted below.

It results from these views that the decree of the District Court was right, and should be affirmed so far as it adjudged appellants A. W. Sewell and Hattie F. Sewell to be the owners of two-thirds of the one-half interest held by Harriet Sewell in the minerals which are the subject of this appeal, but that the decree is erroneous, and should be reversed, so far as it extended such adjudication of ownership to the one-half interest originally held by John W. Sewell.

The record is accordingly remanded to the District Court, with directions to enter a decree as modified by this opinion. The costs of this court will be divided.