LOVEWELL et al. v. SCHOOLFIELD et al.

(Circuit Court of Appeals, Sixth Circuit.   October 9, 1914.   On Petitions for Rehearing, December 16, 1914.)

Nos. 2375, 2376, 2377 and 2391.

1. EXECUTORS AND ADMINISTRATORS (§ 502*)—ACTIONS FOR ACCOUNTING BY EXECUTORS—STATEMENT OF ACCOUNTS.

By a will disposing of a considerable estate the same persons were made executors, with a wide discretion both as to the time of settlement and the method of disposing of the assets, and also trustees of property constituting a large part of the residuary estate, which was to be held in trust and the income only paid to a niece of the testator and her children until her youngest child reached majority.   Testator was a member of a partnership, a stockholder in several business corporations, and also obligated as surety and indorser for others, all of which delayed the settlement of the estate which had not been closed when the last of the executors died 16 years after the death of the testator.   In the meantime they had made considerable advances to the beneficiaries of the trust estate, and also to others of the residuary legatees, all of which was shown in their periodical reports and was known to the probate court. *Held*, that on an accounting between their legal representatives and bondsmen and their successor trustee there was no imperative requirement that their accounts as executors should be stated in advance of or as formally separate from their accounts as trustees.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 2149–2152; Dec. Dig. § 502.*]

2. EXECUTORS AND ADMINISTRATORS (§ 514*)—ACTIONS FOR ACCOUNTING BY EXECUTORS—PARTIAL SETTLEMENTS AS EVIDENCE.

The executors from time to time filed reports and made settlements with the probate court, as required by Shannon's Code Tenn. § 4031 et seq., which provides that the clerk shall state the accounts of executors and report the same to the court for settlement on notice to persons interested, and that "settlements, when so made and recorded, shall be prima facie evidence in favor of the accounting party."   Section 5567 also provides that "settlements of personal representatives and guardians made in the county court in pursuance of law are to be taken as prima facie correct."   The accounts of such executors were so stated and reported by the clerk as annual or partial settlements, and approved and recorded.   *Held*, that where they were not attacked until many years afterward and after the death of the executors, and apparently all others having a personal knowledge of the facts, they were properly taken as prima facie correct on the accounting, although the record did not show affirmatively the giving of the statutory notice.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. § 2292; Dec. Dig. § 514.*]

3. EXECUTORS AND ADMINISTRATORS (§§ 473, 474*)—ACTION FOR ACCOUNTING BY EXECUTORS—STATING OF ACCOUNT.

In a suit for an accounting by executors brought after their death, their settlements, made from time to time with the probate court and which under the state statute were prima facie correct, were properly made the basis of the accounting, and where the bill set out a large number of items in such settlements which were criticized, and showed a familiarity with the affairs of the estate, it was not prejudicial error to confine the inquiry to such items.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 2041–2060; Dec. Dig. §§ 473, 474.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
217 F.—44

4. EXECUTORS AND ADMINISTRATORS (§§ 473, 474*)—ACTION FOR ACCOUNTING BY EXECUTORS—MASTER'S REPORT.

In such a suit the report of the master to whom the cause was referred was not subject to objection because it did not contain a complete statement of the executors' account in debtor or creditor form, where it contained itemized exhibits and schedules which, in connection with the inventory and settlements made by the executors, afforded more complete information than such a statement would have done.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 2041–2060; Dec. Dig. §§ 473, 474.*]

5. EXECUTORS AND ADMINISTRATORS (§§ 473, 474*)—ACTION FOR ACCOUNTING BY EXECUTORS—MASTER'S REPORT.

On such an accounting it is not an objection to the master's report that it was based in part on the cashbook kept by the executors, who died prior to the suit, which was unimpeached and contained entries of all cash transactions relating to the estate, and was used by the master as explanatory of and supplementary to the executors' settlements.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 2041–2060; Dec. Dig. §§ 473, 474.*]

6. APPEAL AND ERROR (§ 1022*)—FINDINGS OF MASTER—REVIEW BY APPELLATE COURT.

The findings of a master on an accounting before him, concurred in by the court, should not be disturbed by an appellate court unless clearly wrong.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4015–4018; Dec. Dig. § 1022.*]

7. PARTNERSHIP (§ 245*)—REAL ESTATE—CONVEYANCE BY SURVIVING PARTNERS.

A purchaser of real estate, owned by a partnership from the surviving members who had authority under the partnership articles to sell, is not bound to look to the application of the proceeds, but acquires a good title.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 514–518; Dec. Dig. § 245.*]

8. HUSBAND AND WIFE (§ 115*)—PERSONAL ESTATE OF WIFE—AGREEMENT OF HUSBAND TO RETENTION AS SEPARATE ESTATE.

While at common law the personal estate of a wife by the marriage becomes the property of her husband, he is not bound to assert such marital right, but may validly agree, either expressly or impliedly, to her retention of her personal property as her separate estate.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 408–412; Dec. Dig. § 115.*]

9. EXECUTORS AND ADMINISTRATORS (§ 93*) — CHARGES ON ACCOUNTING — RENTS.

Executors had no authority to operate at the risk of the estate a plantation in which the estate held a large interest, but are liable for the rental value of such interest.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 407, 408; Dec. Dig. § 93.*]

10. EXECUTORS AND ADMINISTRATORS (§ 528*) — LIABILITY OF SURETIES — RENTAL VALUE OF REAL ESTATE.

Under the law of Tennessee sureties on the bond of executors are liable for the rental value of the interest of the estate in land situated in another state, where such interest is personal property and was shown on the executors' inventory.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 2375–2394; Dec. Dig. § 528.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

11. TRUSTS (§ 231\*) — TESTAMENTARY TRUST — ACCOUNTING BY TRUSTEE — CREDITS.

An executor and trustee under a will, to whom real estate in which both he and the estate had an equitable interest was conveyed as such trustee to be held for the trust estate, *held* entitled on an accounting to credit for the value of his personal interest in the property.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 330-335; Dec. Dig. § 231.\*]

12. TRUSTS (§ 231\*)—TESTAMENTARY TRUST—ACCOUNTING BY TRUSTEE.

An executor and trustee under a will who, on the insolvency of a corporation of which he and the estate were stockholders, and which was a large creditor of the beneficiary of the trust, with the consent of the court purchased the account against her *held*, on an accounting as trustee, entitled to credit only for the amount which the claim cost him, and not for the amount of the claim.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 330-335; Dec. Dig. § 231.\*]

13. EXECUTORS AND ADMINISTRATORS (§§ 106, 118\*)—ADMINISTRATION OF ESTATE—LOANS—LIABILITY OF EXECUTOR.

An executor who, as well as the testator, was a large stockholder in a business corporation *held* not authorized to lend money of the estate to such corporation without security, but not liable for the loss of the stock belonging to the estate through insolvency of the corporation.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 433, 472-482; Dec. Dig. §§ 106, 118.\*]

14. EXECUTORS AND ADMINISTRATORS (§ 160\*)—POWERS—PRIVATE SALE OF CORPORATE STOCKS.

Shannon's Code Tenn. § 3979, requiring executors and administrators to "make sale of the goods and chattels of the deceased to the highest bidder on 10 days notice," if construed to prohibit private sales and to include as goods and chattels corporate stocks, does not control the discretion of executors, given by the will "full and ample authority and power \* \* \* to use their discretion" in the settlement of the estate, and such executors cannot be held liable on account of the private sale of stocks, where they exercised the discretion which a reasonably prudent and intelligent man would have used in the administration of his own affairs.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. § 637; Dec. Dig. § 160.\*]

15. EXECUTORS AND ADMINISTRATORS (§ 281\*)—ACCOUNTING BY EXECUTORS—CLAIMS PAID AFTER TIME LIMITED BY STATUTE.

Under a statute requiring executors to pay proved claims against the estate within a stated time after issuance of letters testamentary, where claims were paid after such time the presumption is, in the absence of proof to the contrary, that the delay was at the request of the executor, and he is not liable as for an illegal payment.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 1102-1104, 1106-1115; Dec. Dig. § 281.\*]

16. EXECUTORS AND ADMINISTRATORS (§ 494\*)—ADMINISTRATION OF ESTATE—EXECUTOR AS ATTORNEY FOR ESTATE—FEES.

Under the laws of Tennessee an executor, acting also as attorney for the estate, may recover compensation for his services in both capacities.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 2084-2087; Dec. Dig. § 494.\*]

17. EXECUTORS AND ADMINISTRATORS (§ 314\*)—TIME OF ACCRUAL OF RIGHT TO DEVISE OR BEQUEST—RESIDUARY LEGATEES.

Where the settlement of the estate of a testator was justifiably delayed through a number of years, owing to the nature of the property

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and liabilities of the testator, limitation does not run against the claims of residuary legatees to their respective shares during the time of such delay.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 1274–1297; Dec. Dig. § 314.*]

Appeals from the District Court of the United States for the Western District of Tennessee; John E. McCall, Judge.

Suit in equity by James H. Lovewell, as trustee, and others, against Dudley T. Schoolfield, individually and as executor of the will of W. W. Schoolfield, deceased, and others. From the final decree, appeals were taken by complainants, by Lena Bakrow and Charles Bakrow, her husband, as cross-complainants, by John H. Poston and another, sureties on the executor's bond, and by Dudley T. Schoolfield, individually and as executor, etc. Modified and affirmed.

Wm. M. Randolph, of Memphis, Tenn., for appellants Lovewell and others.

Caruthers Ewing, of Memphis, Tenn., for appellant Hill.

G. J. McSpadden, of Memphis, Tenn., for Mr. and Mrs. Schoolfield.

J. H. Poston, Jr., of Memphis, Tenn., for appellant Poston.

A. W. Biggs, of Memphis, Tenn., for John Wade & Sons.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

KNAPPEN, Circuit Judge. Louis Hanauer, of Memphis, Tenn., died August 21, 1889, without issue, leaving a will, which is printed in the margin.[1] He was at the time a member of the firm of School-

[1] "I, Louis Hanauer, of Shelby county, Tennessee, do make and declare my last will and testament as follows, viz.:

"Item First. I revoke and annul all former wills by me made.

"Item Second. I direct that any just debts I may owe at the time of my death be paid by my executors as promptly as possible without detriment or sacrifice to my estate.

"Item Third. If, at my death, I am indebted as guardian to Flora and Jacob Hanauer, or either of them, I especially request and direct that interest thereon shall, without fail, be paid them four times a year, so long as any of said indebtedness remains unpaid.

"Item Fourth. I give and bequeath to Walter, Willie and Cora Lowder and their sister Ida (now Hoffman), each the sum of five hundred dollars.

"Item Fifth. I give and bequeath to each of the children of my sister Teresa, the sum of five hundred dollars.

"Item Sixth. I give, bequeath and devise the one-half of all the residue of my estate to my niece, Mary Hampson and her children who may be living at the time of my death, and also those thereafter born to her, she and her children taking equal share and share alike. The property given by this item of my will is to be vested in the trustees hereinafter named, and to be possessed, controlled and managed by them, and only the net income therefrom paid over to Mrs. Hampson, for the support and maintenance of herself and children, and the property interests of said Mrs. Hampson to be her separate estate, free from all control, marital rights and liabilities of her present, or any future husband. Upon the lawful coming of age of the young-

field, Hanauer & Miller, wholesale grocers and cotton factors, each partner having a one-third interest. The testator's brother, Jacob Hanauer, then deceased, who had at one time been a member of the firm, left an estate of some value, and two of his children were still under Louis Hanauer's guardianship. The latter was also trustee for the estate of his niece, Mary Hampson (a daughter of Jacob Hanauer, and beneficiary under the 6th item of the will), consisting of upwards of $18,000 personal and an amount of valuable real estate. A few months before the testator's death the copartnership ceased active business, upon the formation of a corporation under the name of the Schoolfield-Hanauer Company. This corporation had a capital stock of $67,000, Hanauer holding $21,000, Schoolfield and Miller

est child of said Mrs. Mary Hampson, then said trustees shall make the proper division of the property given her and them by this item of my will.

"If any of the children of said Mary Hampson shall die before coming of lawful age, his or her share shall go in equal parts to his or her brothers or sisters.

"Item Seventh. My home place on the south line of Kerr avenue, near Memphis, Tenn., I wish to go to the parties named as legatees in the sixth clause of this will, in the proportions and upon the terms, conditions and limitations therein provided and stipulated, as to the property given thereby, and I make it a condition precedent to the vesting or taking effect of the sixth item of this will that said Mary Hampson shall, by proper and sufficient conveyance, duly recorded within sixty days from the probate of this will, convey said homestead place to said trustees, upon the trust terms and limitations aforenamed in the sixth item hereof.

"Item Eighth. All the balance and residue of my estate, real and personal, I give, bequeath and devise to Fanny Lowrance and the legal heirs of my deceased brother, Jacob Hanauer, equally, that is to say, Fanny Lowrance shall take one-sixth thereof, and said heirs of my brother Jacob the remaining five-sixths (5/6) thereof per stirpes, and not per capita, they being given in number, excluding said Mary Hampson, who shall have and take no interest under this item of my will.

"Item Ninth. In case of the failure of Mrs. Hampson to comply with the seventh item of this will, and the condition therein imposed, then it is my wish and direction that the property given in the sixth item hereof shall go and belong to her children, excluding her from any interest whatever therein, and upon the term and limitations in said sixth item named.

"Item Tenth. Any legatee or devisee hereunder taking steps to litigate or contest this will, shall forfeit all benefits thereunder.

"Item Eleventh. I desire and direct that my estate be settled and wound up hereunder as speedily as possible, without injury to, or sacrifice of same, and to this end I give full and ample authority and power to my executors, hereinafter named, to use their discretion in so settling the same, and if necessary to prevent loss or sacrifice, to postpone the payment of the legacies herein given to such time as will prevent same.

"Item Twelfth. I nominate and appoint my friend W. W. Schoolfield and D. H. Poston, of Memphis, Tennessee, as both executors and trustees to execute this will, giving them full power to sell and convey any property to pay off debts, and also whenever they both agree in opinion that it is to the interest of all concerned to do so, and they shall not in any manner be held liable for any errors in the exercise of such discretion.

"They shall also as such trustees, hold, manage and control the legacies of such of the legatees as are minors, during their minority, paying to the beneficiaries only the net income or interest, with power of sale as above defined.

"Signed and sealed at Memphis, Tenn., this 18th day of September, 1888. [Signature, attestation, etc., omitted.]"

each $19,000, the remaining $8,000 being divided between four others. In payment of its capital stock, it took over the stock in trade of the copartnership, which was dissolved by Hanauer's death, Miller and Schoolfield being thereupon the surviving partners, as well as in practical control of the affairs of the corporation. Schoolfield was also one of the executors and trustees under testator's will, which was admitted to probate August 29, 1889. Poston, the other executor and trustee, had been Hanauer's attorney. The executors immediately qualified, and filed an inventory October 2d thereafter. The estate consisted of: (a) Cash in bank, $9,534.42; (b) nearly $6,000 (net) life insurance; (c) one-third of the net assets which should remain after the liquidation of the affairs of the partnership, Hanauer's apparent or book credit therein being $97,859.13; (d) the Kerr avenue homestead mentioned in the seventh item of the will, together with other real estate interests; (e) a considerable amount of personal property, consisting largely of notes, stocks and bonds, carried in the executors' inventory at about $250,000, treating the corporate stocks at par value. The latter included $54,000 in the National Cotton Seed Oil & Huller Company (hereafter called the Cotton Company); $13,-500 in the Brush Electric Light & Power Company (hereafter called the Electric Company); and $21,000 in the Schoolfield-Hanauer Company. The Kerr avenue homestead was duly conveyed by Mrs. Hampson to the trustees under the will, as provided by the seventh paragraph thereof, to be held for her benefit and that of her children.

In October, 1890, the executors filed in the probate court their first annual account, and in the same month Mrs. Hampson's husband was, by order of the court, made trustee of his wife's interests formerly held by testator in trust for her. In 1891, Poston, one of the executors died, Schoolfield being thereafter sole executor and trustee. He, in 1891, filed a second annual account, covering transactions both before and after Poston's death, and also filed annual accounts in 1895, 1896, 1898, 1901, and 1903. Each of these accounts purported to contain in detail a statement of all the receipts and disbursements connected with the execution of the will and the administration of the entire estate. The first account showed, among other things, payment of $18,837.18 in discharge of testator's liability as guardian of the children of Jacob Hanauer, payment in full of the money legacies under the fourth and fifth items of the will, amounting to $5,500; payment of debts and liabilities of the testator amounting to $8,304.70, including liabilities of $2,075.29 on guaranty and $878.23 as surety; also $36,195.05 as loans and advances to the Cotton Company and Electric Company. The second report showed, among other items, payments of more than $7,000 to Mrs. Hampson on the testator's liability as trustee, and advances of $9,000 to the legatees, against their distributive shares, under the eighth item of the will. Others of the reports included payments to or for the benefit of the legatees under the eighth item, as well as payments to or for Mrs. Hampson, both on account of the testator's liability to her and as beneficiary under the will. The seventh report showed, among other items, payments.

both to Mrs. Hampson and to the beneficiaries under the eighth item, to make good losses on lands and to equalize advances. In 1891, under partition proceedings between the beneficiaries under the sixth and eighth items of the will, certain real estate of the testator, valued at about $18,000, was, by order of the court, conveyed to Schoolfield, as trustee for Mrs. Hampson and her children under the sixth item. So long as the corporation Schoolfield-Hanauer Company did business, collections and disbursements, as well as distributions to the co-partners and their representatives on account of partnership affairs, were made through the corporation, which also furnished Mrs. Hampson large amounts of supplies and money, which were used in support of herself and family. It was wound up by insolvency proceedings in 1896, paying 39 cents on the dollar. When it failed it owed the copartnership, as well as Hanauer's estate, and held a large balance of account against Mrs. Hampson, which was transferred to Schoolfield. The capital stock was of course wiped out. Among the assets of the copartnership at Hanauer's death were: (a) The business property on Front street in Memphis, used as a place of business by the copartnership and later by the successor corporation. This property was sold in 1897 by the two surviving copartners, reaching by mesne conveyances the firm of John Wade & Sons. (b) A debt of one Townsend of $1,653.81, which, together with $4,912.84 owing to W. W. Schoolfield, was secured by a trust mortgage upon land in Shelby county, Tenn., which, in 1898, was sold on foreclosure to Mrs. Schoolfield, wife of the executor, trustee, and partner. By her death her son, Dudley T. Schoolfield, succeeded to her interest, and he later conveyed the property to his wife, Edith Brooks Schoolfield. (c) An indebtedness of $18,529.05 from Ferguson & Hampson, the latter being the husband of Mary Hampson. This was secured ratably with an indebtedness from that firm to testator of $17,776.03, the two debts being subject to a purchase-money lien held by testator of $21,114.60 upon Nodena Plantation, so-called, in Mississippi county, Ark. Foreclosure proceedings were pending at testator's death, and in 1891 the premises were sold thereunder to Frank P. Poston and Dudley T. Schoolfield, as trustees, for the benefit of the creditors named, for $45,000, which was less than the total of all the claims. Hanauer's estate was thus the beneficiary under the trust conveyance, except only an apparent interest on the part of Miller and Schoolfield, each in the amount of $4,796.24. In 1897, six years after the foreclosure sale, the beneficiaries under the eighth item of the will conveyed their interests in the plantation to Schoolfield, trustee, to be held by him for Mrs. Hampson and her children, under the sixth item, subject to the amounts due Schoolfield and Miller, which the trustee, together with Mrs. Hampson and her husband, assumed. Miller transferred his interest in Nodena Plantation to Susan Thomas, now Mrs. Norfleet.

Miller died in 1903. Schoolfield died about October 1, 1905, while still executor and trustee, leaving his son, Dudley T. Schoolfield, as his sole heir, devisee, and legatee. A summary of receipts and expenditures by the executors and trustees, based upon the master's re-

port, is shown in the margin.[2]   Schoolfield's death thus removed the only remaining executor, trustee, and partner.   Upon Schoolfield's death, complainant Lovewell, a son-in-law of Mrs. Hampson, upon application of the latter and her children, through their attorney, was appointed trustee as successor to Schoolfield.   No successor executor has been appointed.

Lovewell, as trustee, filed his bill in the court below on April 8, 1907, to obtain an accounting of the administration of the Hanauer

[2] Total Receipts.

| | |
|---|---|
| Cash in bank at testator's death................................. | $ 9,534 42 |
| Bills receivable collected...................................... | 24,685 34 |
| Stocks and bonds sold......................................... | 58,445 92 |
| Notes paid, property sales and sundry sales (including one-third of purchase price of Front street storehouse belonging to firm) | 26,187 06 |
| Interest and dividends........................................ | 22,541 05 |
| Rents collected.............................................. | 10,296 36 |
| Coupons collected............................................ | 420 00 |
| Receipts from Schoolfield, Hanauer & Co. (not including sale of Front street store)............................................ | 56,970 62 |
| From Cotton Seed Oil & Huller Company......................... | 5,000 00 |
| Tax refund.................................................. | 150 40 |
| Cash (no explanation)........................................ | 577 00 |
| (Note 1.) | $214,808 17 |

Disbursements.

| | | |
|---|---|---|
| Dues and assessments on stock................................. | | $ 3,085 76 |
| Hanauer accounts paid........................................ | | 7,425 99 |
| Guardianship liability paid.................................... | | 18,837 18 |
| Surety liability paid.......................................... | | 628 23 |
| Bequests under fifth item..................................... | | 5,500 00 |
| Taxes ...................................................... | | 4,066 89 |
| Real estate maintenance and expenses.......................... | | 2,179 93 |
| Loans to Schoolfield-Hanauer Company........... | $ 3,000 00 | |
| Loans to Brush Electric Company................. | 19,369 76 | |
| Loans to Cotton Company....................... | 32,424 71 | |
| | | 54,794 47 |
| Rents paid.................................................. | | 60 00 |
| Mary S. Hampson personal account............... | $18,328 13 (Note 3) | |
| Mary S. Hampson advances and payments......... | 9,650 05 | |
| Mary S. Hampson taxes and insurance........... | 3,986 26 | |
| | | 31,964 44 |
| Beneficiaries under eighth item of will—advances and payments.. | | 49,659 57 |
| W. W. Schoolfield, trustee (later charged Mrs. Hampson)........ | | 32 53 |
| Miscellaneous (Note 2)....................................... | | 29,699 15 |
| Executors' compensation...................................... | | 5,713 63 |
| Balance cash in hand......................................... | | 1,160 40 |
| | | $214,808 17 |

NOTE 1.  The receipts take no account of Nodena Plantation ($35,407.51) held for beneficiaries under sixth item, nor of Kerr Avenue homestead, similarly held, nor of contents of home, etc., nor of some other property, both individual and copartnership, yet undisposed of.

NOTE 2.  "Miscellaneous" includes (among other items) five judgments aggregating $12,940.28, attorneys' fees apparently between $8,000 and $9,000, costs of partition cases $659.75, as well as other costs of litigation; also compensation allowed D. H. Poston, after his death, $1,875.00, and amount paid W. W. Schoolfield since last probate court settlement, $1,606.15; the latter two items, added to the $5,713.63 above shown, makes $9,194.78 compensation, including $132.08 allowed Dudley T. Schoolfield.

NOTE 3.  The first two items of charge to Mrs. Hampson were in large part applied upon her account with the Schoolfield-Hanauer Company.

estate, the enforcement of the trusts created by the will, and the recovery by the several devisees and legatees thereunder of the sums claimed to be due them upon an account and settlement of the administration and of the trusts created by the will; also an accounting of copartnership affairs and of the administration thereof by the surviving partners, as well as a confirmation of their title to Nodena Plantation against all claims of Schoolfield and Mrs. Norfleet. The beneficiaries under the eighth item of the will filed a cross-bill, asking the same relief, so far as pertinent. The causes were put at issue and reference made to a special master for an accounting, under express directions that the inventory of the executors and the various partial settlements made with the probate court should be taken as prima facie correct, the defendants not to be held for any item not set out in the inventory and settlement, except upon specific allegations of the special items and sufficient proof supporting the same. The master made a comprehensive and painstaking report, embracing detailed schedules and statements of the transactions had by the executors and trustees. The master was of opinion that the sales of the Front street lot and the Townsend property were valid and effective to pass title to the respective purchasers. As to the Nodena Plantation, the master found that the conveyance in trust for the beneficiaries under the sixth item of the will was made for the purpose of equalizing the advances made to the various beneficiaries, and that their shares were all equalized on July 5, 1903, except that Hester Hayes was overdrawn on that date $124.77. He charged the executors, in addition to the $1,160.40 cash on hand, with items amounting to $42,263.24, plus $46,587.39 interest thereon. Charging to complainants Schoolfield's interest in Nodena Plantation, and the unpaid balance of Mrs. Hampson's account with the Schoolfield-Hanauer Company, the master found due Mrs. Hampson and her children $7,772.34, plus encroachments upon the corpus of the estate of $7,028.40. Mrs. Norfleet's claimed interest in Nodena Plantation was not taken into account. The master found the beneficiaries under the eighth item entitled to slightly varying amounts, aggregating $44,924.16. All these awards were exclusive of real estate unsold.

This report was excepted to by all the parties in interest. After its filing Mrs. Norfleet filed a cross-bill, asking enforcement of her claimed rights in Nodena Plantation. Schoolfield also filed cross-bill, asking similar relief, as well as other affirmative relief in connection with the accounting. Both cross-bills were stricken from the files. The master's conclusions as to the sale of the Front Street lot, the Townsend land purchase, equalization between beneficiaries, and interests in Nodena Plantation were undisturbed. Charges made by the master against the executor, aggregating a large amount, were disallowed by the court in whole or in part. The restated account found $27,262.50 due from Mrs. Hampson and her children. The final decree, after such restatement, awarded cross-complainants Hester Hayes, Lena Bakrow, and Belle Hayes recoveries against the executor and the sureties upon the bond of the executor and trustee, aggregating $5,007.44; dismissed the cross-bill as to Jacob Hanauer and

Flora Loeb, holding that their cause of action was barred by the statute of limitations; denied recovery to Fanny Lowrance because she had propounded no claim; dismissed the bill so far as recovery was sought against the administrator of Miller's estate; adjudged the costs (including the compensation of the special master) one-half against complainants in the original bill, the other half in favor of the cross-complainants as against the defendant Schoolfield, executor, and canceled the bond of the executors and trustees upon payment of such costs and the amounts awarded to the various cross-complainants. It also validated and confirmed the title of Wade & Sons to the Front street property, as well as the Schoolfield title to the Townsend land. Mr. Hampson died in 1907; Mrs. Hampson died September 14, 1910; by her will her property went to her children, the youngest of whom attained majority October 24, 1910.

The complainants in the original bill (No. 2375), the complainants in the cross-bill (No. 2376), the sureties on the executors' bond (No. 2377), and Dudley T. Schoolfield, as executor of W. W. Schoolfield (No. 2391) have taken separate appeals.

Complainants urge that the entire basis of the accounting is radically wrong (a) in awarding a single accounting instead of two separate accounts, the one as between all the devisees and legatees on one side and the executors on the other, and a second between Mrs. Hampson and her children on the one side and the trustee or trustees on the other; (b) in limiting the attack to matters specifically set up by complainants; and (c) in giving prima facie effect to the inventories filed in and settlements made with the probate court; also that the master's report is insufficient, because not containing a statement of the complete account in debtor and creditor form, and that it lacks competent foundation, because based in part upon the executor's cash book.

[1] In the absence of special circumstances calling for a different procedure, the normal course would have been for the executors to first pay the testator's debts, including guardianship liability to his brother's children and the legacies under the third and fourth items, to turn over to the new trustee (Hampson) the funds in testator's hands belonging to Mrs. Hampson, and then to divide what remained (excluding the Kerr avenue homestead) into two parts, distributing the one part to the beneficiaries under the eighth item, and holding the other part in trust for Mrs. Hampson and her children under the sixth item, thus keeping the executorship and trusteeship distinct in both dealings and accountings. But completion of administration was necessarily delayed by testator's relations to certain of the corporations in which he was a stockholder, and his contract obligations, as indorser and otherwise, on various matters, as well as the liquidation of the affairs of the late copartnership, including the acquisition of Nodena Plantation. Mrs. Hampson and her children apparently needed, so far as feasible, the current income from their interests in the estate, and the beneficiaries under the eighth item desired payments as speedily as possible. The same persons were both executors and trustees. By the eleventh and twelfth items of the will they were

given wide discretion, both as to the time of settlement and as to the method of disposing of the assets. Before ordinary administration could properly have been closed the trustees began making payments to both classes of beneficiaries, and continued such advancements until the death of the last surviving trustee in 1905, all with the knowledge of the probate court, as shown by reports made up to 1903. Under these circumstances there was no imperative requirement that the master state the executors' accounts in advance of or as formally distinct from those of the trustees. As will be seen later, the accounting had furnished, in our opinion, the beneficial equivalent of separate accountings.

[2] As respects the effect of the probate court settlements: Section 4031 of Shannon's Code requires the clerk of the court to take and state the executor's account after two years from the latter's qualification, and once every year thereafter until the administration is closed. This account is not to be taken until the clerk has given to interested parties certain actual or constructive notice. Section 4034. The clerk is authorized to examine the accounting party upon oath touching his receipts and disbursements. The statute seems to contemplate the presentation of the clerk's report to the court, action of the court thereon, and a recording of the same. Section 4041 provides that "settlements when so made and recorded shall be prima facie evidence in favor of the accounting party." By section 4039, provision is made for attack upon the completeness of the inventory by any interested person at any time before final settlement. Section 5567 also provides that the "settlements of personal representatives and guardians made in the county court, in pursuance of law, are to be taken as prima facie correct." It has been said that it is the final settlement which is made prima facie evidence for the accounting party (Cannon v. Apperson, 14 Lea [Tenn.] 553, at pages 581, 582), but the rule of prima facie correctness has been made to apply to annual settlements.[3]

Each of the executors' accounts was verified by the executors' oath. In the case of each the clerk reported that he had taken and stated "the annual settlement" or "partial settlement," as the case might be, and "that the same is in all things regular and unexcepted to." In each case the record recites the coming on of the case to be heard on the partial settlements of the executors, and the report of the clerk thereon; and:

"It appearing that said settlement is in all things regular, and that no exceptions have been filed thereto, it is therefore ordered that the said settlement be and the same is hereby in all things confirmed, and that the same be recorded in the settlement records of this court."

With respect to the first two accounts, the clerk reported that he had first caused "due and legal notice to be served on all parties interested in the estate of said Louis Hanauer, deceased, of the day on which the same would be stated." The reports on the remaining ac-

[3] Matlock et al. v. Rice, 6 Heisk. (Tenn.) 33, 36, 38; Alvis v. Oglesby, 87 Tenn. (3 Pickle) 174, 183, 10 S. W. 313; Hammond v. Beasley, 85 Tenn. (15 Lea) 618, 620, 627.

counts omit this statement; and in the case of none of them does the record here show any actual proof of service of statutory notice, or whether or not any party interested appeared, although there is nothing in the record negativing such notice, which should perhaps be presumed as against collateral attack. Butterfield v. Miller (C. C. A. 6th Cir.), 195 Fed. 200, 203, and cases there cited at latter page, 115 C. C. A. 152. Several of the Tennessee decisions at least impliedly, and one or more, we think, expressly, recognize the prima facie evidential effect of even an ex parte settlement.[4] Under this state of the Tennessee decisions, and in view of the facts that these settlements were first attacked long after they were made, and after the death of both of the original surviving partners, as well as of both executors and trustees, and, as would appear, of every one having any personal intimate knowledge of the facts, and, further, that vouchers for disbursements made were in large part filed with the reports, we think no error was committed in giving these judicially approved settlements prima facie effect.

[3] Upon the question of pleading: It has been held that on attacking a settlement which is only prima facie correct the complaining party is entitled to a full accounting, without specifying in the bill the items complained of (Turney v. Williams, supra, 7 Yerg. [Tenn.] at page 213; Leach v. Cowan, supra, 125 Tenn. at page 205, 140 S. W. 1070, Ann. Cas. 1913C, 188), yet, as the settlements were prima facie evidence in favor of the executors, they were properly made the basis of the accounting (Matlock v. Rice, supra, 6 Heisk. [53 Tenn.] at page 38; Alvis v. Oglesby, supra, 87 Tenn. at page 183, 10 S. W. 313); and as the suits in question were begun after the death of the parties of whose acts an accounting was sought, and as the bill indicates considerable familiarity with the history of the estate and sets out in great detail items in the accounting criticized, and as all accessible means of information seem to have been in fact presented, and all items which there was shown any disposition to controvert seem to have been inquired into as fully as possible, we think complainant could not have been prejudiced by the requirement that the errors complained of be specified in the pleading.

[4] We see no merit in the criticism that the master's report was not accompanied by a complete statement of the account in debtor and creditor form. The report proper discussed all the important questions presented. At its close the master reported that he had, in obedience to the order of reference, "stated the account from the inventories and partial settlements of the creditors with the probate court, as surcharged by the findings of the master as set forth." The inventories and probate court settlements were already in the record. The report was accompanied by a large number of exhibits and sched-

4 Matlock v. Rice, 6 Heisk. (53 Tenn.) 33, 38; Turney v. Williams, 7 Yerg. (Tenn.) 172, 210; Snodgrass v. Snodgrass, 1 Baxt. (Tenn.) 157, 160, 161; Hammond v. Beasley, 83 Tenn. (15 Lea) 618, 627; Murray v. Luna, 86 Tenn. 326, 331–332, 6 S. W. 603; Alvis v. Oglesby, 87 Tenn. 174, 183, 10 S. W. 313; Vacarro v. Cicalla, 89 Tenn. 63, 76, 14 S. W. 43; Leach v. Cowan, 125 Tenn. at page 205, 140 S. W. 1070, Ann. Cas. 1913C, 188.

ules, containing not only summaries but itemized statements upon most of the important subjects involved (the latter showing dates, names, and amounts), all amounting to about 47 pages of the printed record. These included a statement of the amount and character of the property received by the executors from the surviving partners, the personal assets of the testator's estate outstanding and undisposed of according to the probate court accountings (both as to those considered good and those regarded worthless), a statement of income and expenditures (both as covered by and since the probate court accountings), a history of the liquidation of stocks, bonds, and other securities, the executors' special account with the estate, schedules of bills receivable paid, of stocks, bonds, and other securities sold, of interest and dividends received, of rents collected, of coupons cashed, of property sales and receipts from the partnership, of miscellaneous disbursements, of testator's debts, dues upon stocks paid, payment of guardian's liability, discharge of taxes on real estate and maintenance thereof, a recapitulation of advancements, payments, and expenditures for accounts of legatees (including insurance and taxes), of loans and advances to various corporations, schedules showing the total remaining equity of each beneficiary under the sixth and eighth items (exclusive of real estate unsold), and how arrived at; also a statement of revenue and expenses relating to the encroachments by Mrs. Hampson upon the corpus of the estate. It is evident that the information so furnished by the master's report, in connection with the inventories and probate court settlements, afforded more valuable information than could have been conveyed by a single, continuous debtor and creditor statement.

[5] The executors' cashbook purports to be a cash account of the executors' transactions. It comprises 61 pages, and extends from August 31, 1889, when it started with a balance in the German Bank to testator's credit (being the item shown on the inventory), until January 4, 1906, a few months following Schoolfield's death, the only entries following which event were an item of cash to Dudley T. Schoolfield, executor, and the bringing down of the cash balance to January 4, 1906. The account was continuous, with numerous strikings of balance, frequently shown as the balance in bank. The cash balance was not struck on the book as of the exact date of the first and second settlements; but in the case of each of the others the balance shown thereby appeared on the cashbook in precisely the same amount, except in one instance with a variation of one cent. The book was evidently kept with scrupulous care, and the balance shown on January 4, 1906, was the amount of cash actually in bank to the credit of the executors. Reports on which probate court settlements were made were evidently made from this cashbook. The master reports that he took the book as a basis, "showing the receipts and disbursements of the executors and trustees" from July 15, 1903 (which was the date of the last partial settlement with the probate court), "as he finds from the deposition of said Schoolfield, and from other evidence in the record, including the cashbook itself, that it reliably shows such receipts and disbursements." The entries since July 15, 1903, are all

on the last four of the 61 pages. We do not understand the book to have been used to override the probate court settlements, but only in confirmation or in explanation and supplement thereof. The rule that the settlements are binding on the executors was not relaxed. When the testimony was taken both executors were dead, as was also Frank P. Poston, who had acted as attorney of the estate since the death of executor D. H. Poston, in 1891, until the death of W. W. Schoolfield in 1905, and "had charge of the accounts and business relating to both trusts under the will," and who had kept the cashbook in part. There were presented check stubs and canceled checks, so far as in the possession of Dudley T. Schoolfield, who appears to have been the only person then living having any substantial knowledge of the situation, and who testified with apparent freedom and fullness with respect to the slight knowledge he had. Due notice of the existence of the cashbook entries was given complainants, a copy thereof being attached to the answer of Dudley T. Schoolfield. Its authenticity is not open to question, and it seems clear, to say the least, that complainants were not prejudiced by its use.

The remaining assignments presented by complainants in the original bill cover a wide range. Besides attacking the sale of the Front street lot and the Townsend purchase, complaint is made that the executors and trustees have not been required to account for all the property inventoried by them, including large items of credits and corporate stocks, or for the use of partnership property and the avails of collections; that, in particular, they should be charged with failure to collect rent on the Front street property during its occupancy by the corporation, and with rent for the Nodena Plantation from 1891 to 1897, when it went into Mrs. Hampson's possession; with loss of the capital stock of the corporation, the failure to collect certain of its accounts, and for debts owing by the corporation to the partnership alleged to have been misapplied, also for disastrous loans made to the Cotton Company and the Electric Company. The charge is also made that the executors were credited with payment of debts barred by the statutes of limitation. Cross-complainants join in the assignments relating to all these matters of complaint. Complainants in the original bill also attack the credit given the executor for Schoolfield's interest in Nodena Plantation. Complainants in the cross-bill also complain that they were denied a separate and distinct accounting relative to sums due them as legatees, of the rejection of the claims of two of the cross-complainants, and for lack of sufficient particulars of the amounts charged as received by cross-complainants. The defendants' assignments, so far as material, will sufficiently appear from the discussion.

[6] Complainants' exceptions to the master's report were all overruled by the court, and as to matters to which they relate we have thus in effect the concurrent findings of master and court, which should not be disturbed unless clearly wrong. See the decisions of this court in Haines v. Bank, 203 Fed. 225, 228, 121 C. C. A. 431; Western Transit Co. v. Davidson, 212 Fed. 696, 701, 129 C. C. A. 232; In re National Pressed Brick Co., 212 Fed. 878, 881, 129 C. C. A. 398.

[7] *The Sale of the Front Street Business Property.* Disregarding forms, the net effect of this transaction was that Schoolfield and Miller, as surviving partners, sold the premises to Mrs. Hill for $13,500. Miller's one-third went to Mrs. Norfleet, as his creditor, Hanauer's share was charged to and accounted for by his executor and trustee, and presumably Schoolfield received his one-third. Mrs. Hill afterwards conveyed to her husband, and they to the firm of John Wade & Sons, who still hold it. The latter paid what we are satisfied was at the time a fair price for the property, all upon the advice of counsel that the surviving partners had full authority to convey. The sale was made with the approval of at least the legatees under the eighth item of the will. Wade & Sons are completely protected; for we have no doubt that the partnership articles, which provided for sale by the survivors of real as well as personal property, according to their judgment, afforded ample authority to make the sale. This being so, the purchasers were not bound to look to the application of the proceeds, even had they not been properly applied. Potter v. Gardner, 12 Wheat. 498, 502, 6 L. Ed. 706; Holden v. Circleville L. & P. Co., 216 Fed. 490, 132 C. C. A. 550, decided by this court June 8, 1914. There was, however, no misapplication of proceeds, for although the surviving partners had the right to hold the entire proceeds of the sale subject to accounting, it was entirely competent for the survivors and the executors to divide up the proceeds of a particular parcel, so long as there remained, as seems to have been the case, ample assets for the payment of all obligations and the adjustment of all balances between partners. In the view we take of the case, it is unnecessary to consider what the situation would have been but for the partnership agreement, nor the questions raised as to the lack of power in Mrs. Hill, as a married woman, to convey to her husband (for both joined in the conveyance to Wade & Sons), nor the question of constructive notice afforded by the abstracts and conveyances.

*The Townsend Foreclosure Sale.* The land was sold, under foreclosure of the trust deed, for $3,500, which was less than the debt secured to Schoolfield. The master seems to have treated the trust deed as securing ratably the debt to Schoolfield individually and the debt to the copartnership, and disposed of the matter by concluding that there was no evidence tending to show fraud with reference to the sale and transfer of the land by the trustee in the deed and the purchase of the same by Mrs. Schoolfield at the sale, and that there was no evidence tending to show that the executor did not account for the part of the proceeds of the sale due the firm of Schoolfield, Hanauer & Co.

As we construe the trust deed, however, the partnership claim was subordinated to Schoolfield's individual claim, and there was thus nothing to apply on the partnership claim. The substantial question concerns complainants' contention that the conveyance to Mrs. Schoolfield was in effect a conveyance by her husband without consideration and in fraud of creditors, and that the property is thus liable for the satisfaction of whatever balance may be found against Schoolfield on this accounting. We are satisfied that the allegations of actual and purposeful fraud in the conveyance to Mrs. Schoolfield are wholly unsus-

tained; for Schoolfield, though of greatly reduced means, was entirely solvent at the time, and so remained until his death, unless as against such liability as may be established under this accounting; and we have no reason to think that he regarded himself as subject to any liability of this nature. But even if we were to find that the property was conveyed to Mrs. Schoolfield while her husband was insolvent, yet if she actually paid the purchase price, that is the end of the inquiry. The burden is upon complainants to show such nonpayment, and the contrary is presumed from the recitals in the trustee's foreclosure deed. The statement therein that the net purchase price paid the trustee was "applied as a credit upon the note secured by the said trust deed" does not controvert actual payment by the purchaser. Nor is the presumption overthrown by the mere fact that after the death of both Mr. and Mrs. Schoolfield no proof could be found of the latter's actual payment, either by check or otherwise, in view of the testimony of her son, although more or less indefinite, that his mother had personal property of her own.

[8] It is urged, however, that her personal estate became by marriage the property of her husband, and that thus no consideration could have resided in the transfer of money by her to him. It is true that such would be the result of his assertion of marital right, but he was not bound to assert such right (Carpenter v. Franklin, 89 Tenn. [5 Pickle] at page 148, 14 S. W. 484); he could validly agree, either expressly or impliedly, to her retention of her personal property as her separate estate (Snodgrass v. Hyder, 95 Tenn. [11 Pickle] at pages 575–577, 32 S. W. 764); and the testimony that she kept a bank account in her own name and held stocks and funds in another bank, and gave money from time to time to her son, all presumably with her husband's acquiescence, tends to support an implied relinquishment of his marital right (Belford v. Scribner, 144 U. S. at page 504, 12 Sup. Ct. 734, 36 L. Ed. 514). We are satisfied that the decree below reached the correct result regarding this claim.

[9] *The Nodena Plantation.* In 1891, following the foreclosure purchase, the executors and surviving partners contracted with Ferguson for operating the plantation on joint account, Ferguson to have one-half the net profits, the other parties the remaining one-half. Each party to the transaction was to furnish certain equipment or supplies, or both. The supplies were in fact furnished by the Schoolfield-Hanauer Company, which kept an account with the plantation. The cotton raised was to be shipped to the Schoolfield-Hanauer Company for sale. The operation was carried on for five years, resulting in a loss to the Schoolfield-Hanauer Company.

We think the executor had no authority to carry on this business at the risk of the estate; he should have rented the plantation; and we agree with the master and court that the estate is entitled to compensation. It is urged that as the interest of Hanauer's estate was personal, a rental charge would be improper. The court charged interest upon the estate's investment, instead of rental as charged by the master. Both parties agree that the estate's interest was personal, but that, to our minds, is not a sufficient reason for denying rental as such. Had the property been a livery stock or a boat, either of which would be

personal, the propriety of charging rental for actual use of the property could scarcely be doubted. The real question is what rental could reasonably have been obtained therefor. The master found that the plantation was operated at a profit; that the loss resulted from parts of the contract other than rental; that there were about 1,200 acres of cultivated land, and that the rental value was $4,000 per year. The executor was charged with the estate's proportion of that rental, with interest on each year's rental from the first of the succeeding year. The testimony as to rental value is in conflict, ranging from $2 to $7 per acre for cleared land. Hanauer seems to have received and collected $4,000 for its rental in 1889. Cotton culture was depressed from 1891 to 1896; and perhaps $3,600 per year ($3 per acre) is the safer estimate of value. It may be fixed on that basis, including interest as charged by the master. Such rental in fact closely approximates the manager's estimate of profit, viz., $20,000. We think that under the Tennessee statute and decisions the sureties on the executor's bond are liable for the rent, notwithstanding the executor was acting not as executor but as trustee. Porter v. Moores, 4 Heisk. (Tenn.) 16; Lester v. Vick, 2 Heisk. (Tenn.) 476, 479.

[10] It is insisted, however, that the bondsmen are not liable for rent of lands in another state than that in which the administration is had. We see no force in this proposition. It was held, it is true, in Snodgrass v. Snodgrass, 1 Baxt. (Tenn.) 157, 162, that the sureties of an administrator are not liable for the proceeds of property received by him from the sale of his intestate's lands in another state. The reason there given is that the proceeds of the sale of land in Virginia were not assets of the estate in Tennessee, where the administration was granted, but were received in Virginia, and not in the character of administrator in Tennessee. In this case, however, the indebtedness which the plantation later represented was included in the executor's inventory, the foreclosure having been completed after testator's death. We think the plantation, being, as stated, personal property, was plainly Tennessee assets, and within the security of the executor's bond. We may add that the master correctly found that the conveyance of the plantation in the interest of Mrs. Hampson and her children was intended to equalize the advances to the respective beneficiaries up to that date.

[11] The complainants in the original bill criticize the decree for crediting the executor with the amount of Schoolfield's interest in the plantation ($4,796.24, plus interest thereon), and for failing to adjudge that Mrs. Norfleet, as the assignee of Miller's claim, had no title or interest in the plantation. It is contended that the deed made by Dudley T. Schoolfield and Frank H. Poston (trustees under the commissioner's deed of foreclosure) to W. W. Schoolfield, as trustee under the sixth item of the will, conveyed the entire fee of the plantation, thus discharging all the liens and interests theretofore held by the two surviving partners other than Hanauer by virtue of the indebtedness to the firm, which constituted part of the price paid on foreclosure sale; that by the terms of the conveyance to W. W. Schoolfield, trustee, the latter and Miller were to look only to the personal responsibility of Mr.

and Mrs. Hampson; and that, in any event, recovery could not be had in the absence of cross-bill.

We think the executor was rightly credited with the amount of Schoolfield's interest, even if the entire fee was conveyed to him as trustee under the sixth item; for, if so (as we must not be understood as holding), we think it clear that payment of his interest was equitably assumed on behalf of the beneficiaries, rather than left to the personal responsibility of Mr. and Mrs. Hampson; and, this being so, equity requires the enforcement of that assumption. If W. W. Schoolfield so held the legal estate no question of lien or of limitation is involved. If the legal title remained in part in Poston and Dudley T. Schoolfield, trustee, complainants are not prejudiced by the disposition made. The item being treated merely as a credit under the accounting, no cross-bill was required. The beneficiaries under the sixth item having taken the benefit of Hanauer's one-third interest in the firm debt, and having recognized Miller and Schoolfield as entitled to the balance, cannot well be heard to say that Schoolfield should be denied his part because there had been no full settlement of partnership affairs. As to the Miller interest: It is clear that, as he was not a party to the conveyance in question, and as there is no room for claim that he consented to the conveyance of the entire fee to Schoolfield, trustee, in relinquishment or limitation of his rights under the original trust, and as Dudley T. Schoolfield is before the court denying that his conveyance had such effect and recognizing his continued trusteeship for the benefit of Mrs. Norfleet, the decree could not properly adjudge that the entire fee passed under the conveyance to W. W. Schoolfield, trustee, nor quiet complainants' title as against Mrs. Norfleet's claim unless barred by limitation. The court treated Mrs. Norfleet's claim as not within the pleadings or the order of reference, and she has not appealed. As we find no error assigned upon the failure to find her claim barred by limitation, we content ourselves with affirming the decree in the respect under consideration, but without prejudice to such proceeding as either party may take to determine Mrs. Norfleet's rights.

*Mrs. Hampson's Account with the Schoolfield-Hanauer Company.* This account was opened August 26, 1889, shortly after Hanauer's death. Testator held at his death two notes of Ferguson & Hampson, payable to his order as guardian of Mary S. Hampson, given in 1877 and 1881, respectively, aggregating (principal) $9,623.43. The executor treated these notes, and we think correctly, as uncollectible through the neglect of the testator, and thus as liabilities on the part of his estate to Mrs. Hampson personally. On three separate dates up to and including December 3, 1890, the executor indorsed on these notes an aggregate of $7,138.92, all of which was receipted for by Mr. Hampson as trustee of his wife, and presumably with his wife's approval, the greater part being applied on Mrs. Hampson's account with the Schoolfield-Hanauer Company. May 2, 1895, the balance due on these notes ($12,439.46) was similarly applied upon the account mentioned, and at the same time $4,990.43, as "one-half of interest and dividends collected" upon the assets of the estate, to which Mrs. Hampson was declared entitled under the will for the support of herself and children. The draft for

$12,439.46, as well as the receipt for $4,990.43, were signed by both Mr. and Mrs. Hampson. All these payments to Mrs. Hampson appear on the probate court settlements. They reduced her account with the Schoolfield-Hanauer Company to $13,732.37. On June 2, 1906, when the corporation went into liquidation, the account had increased (including interest) to $24,585.95. With the approval of the court having the liquidation in charge Schoolfield purchased this account, applying the amount thereof upon his large claim against the corporation. This action was taken for the avowed purpose of protecting Mrs. Hampson. All these payments upon account (except the balance last referred to) are included in the items of disbursements made to Mrs. Hampson, appearing on the summary of the executor's receipts and disbursements. The item of $4,990.43 was included in the item of $9,650.05, the bulk of the balance being also applied on the account with the Schoolfield-Hanauer Company, although as to items aggregating $2,881.53 no order therefor by Mr. or Mrs. Hampson is shown. The balance so taken over by Schoolfield was included in making up the balance found in the master's restatement of account to have been overdrawn by Mrs. Hampson.

[12] Complainants object to the payment of the Ferguson & Hampson notes by the executor, and to their application upon Mrs. Hampson's account, for the reasons, among others: (a) That the debt from Ferguson & Hampson did not belong to Mrs. Hampson, she being a married woman, but to her husband; (b) that, Hampson being thus both payor and payee, there was no legal debt; (c) that the testator did not intend to pay the notes, but to extinguish them through the legacy to Mrs. Hampson; (d) that the notes were outlawed before Hanauer's death; (e) that Mrs. Hampson, not being examined separately from her husband, could not rightly direct the application of these notes. These claims are, we think, without merit. Whether the debt was outlawed as against Ferguson & Hampson cuts no figure, because the master's application is based upon the proposition that Hanauer was liable to Mrs. Hampson personally for failing to collect the notes; there is no basis for the claim that testator intended to extinguish the notes by legacy; the liability from Hanauer was to Mrs. Hampson and in a trust capacity, under postnuptial settlement, in which trust the husband was practically the successor, as the notes obviously represented the investment of some of Mrs. Hampson's money. Mr. Hampson, as trustee, participated in carrying out the transaction.

The application of the $4,990.43, as one-half the income of the estate, is criticized for the reasons, among others: (a) That no such income could be paid until the administration was completed and the funds turned over to the trustees; (b) that Mrs. Hampson could not validly contract the indebtedness to the corporation for living expenses; (c) that no attempt was made to apportion income by the executors and trustees in any other instance; and (d) that such income could only be charged out of the one-half covered by the sixth item. But although the executors did not bodily turn over to the trustees the residue above the payments of debts, etc., the same persons were both executors and trustees, and dealt with the beneficiaries under the sixth and eighth

items in the latter capacity, whether so expressed or not, in making the advances against the distributive shares, etc. If the criticism suggested is good, neither Mrs. Hampson nor the beneficiaries under the eighth item had any right to the large sums advanced to both classes, including Nodena Plantation turned over under the sixth item; and to say that it was the duty of Mr. Hampson to support his family ignores the fact found by the master, viz., that Mr. Hampson was without capacity to support them, a condition presumably recognized by the testator in the provision made by the sixth item. To deny Mrs. Hampson the right to use the income of the estate for the support of herself and her children would be pro tanto to nullify the will under which the accounting is asked; Hampson, in fact, as his wife's trustee, approved the application upon the debt in question. It is thus immaterial whether or not the corporation could have enforced collection against Mrs. Hampson as a personal debt. See Flanagan v. Grocery Co., 98 Tenn. 599, 40 S. W. 1079. To the extent that the moneys of the testator's estate applied on the debt of the corporation caused encroachment upon the corpus of the trust estate under the sixth item other considerations pertain, which are not material in this immediate connection. The balance of account held by Schoolfield presents different considerations, but not, we think, controlling. We are satisfied that the indebtedness was incurred on Mrs. Hampson's credit; and, in view of the relations existing between herself, the estate, the corporation, and the executor and trustee under the will, we think it equitable that Schoolfield should be reimbursed, but only for what that account has cost him, which is the extent to which his own recovery from the corporation assets has been decreased by the application of Mrs. Hampson's account on his claim as creditor. We reach this conclusion because the account seems to have been regarded as of doubtful collectibility, for the time being at least.

Schoolfield, the executor and trustee, was also president of the corporation, upon a substantial salary, and the large indebtedness against Mrs. Hampson was the outgrowth of that dual relation. The contracting of the account, and its purchase by Schoolfield, involved to an extent a fiduciary relation. To permit the executor and trustee to recover more than he paid for the account would give him a profit on the transaction, which would be inequitable, notwithstanding his loss in other respects. The beneficiaries likewise have lost through the failure of the corporation.

*The Schoolfield-Hanauer Company.* A short time before this corporation went into liquidation the executor had advanced to it two sums aggregating $3,000. Repayment had not been made. The corporation also owed the copartnership at the time of liquidation (including interest) $16,630, by reason of undistributed collections on account of the copartnership. In connection with the adjustment of Mrs. Hampson's account with the corporation, the executor had overdrawn Hanauer's third of the last distribution to the extent of $1,303.73. Nodena Plantation owed the Schoolfield-Hanauer Company a balance of $9,345, representing loss from the joint operation of the plantation. The copartnership filed, in the insolvency proceedings, its claim for

$16,630, the executor filing a similar claim for the $3,000 advance, plus $124.85, which the corporation owed Hanauer at his death, plus another account of $192.84, less the $1,303.73 above mentioned. By a compromise made in the liquidation proceeding, one-quarter of the Nodena Plantation account was charged against the copartnership claim, dividends of 39 per cent. being collected on the balance and accounted for by the executors. Another one-quarter of the Nodena debt was charged against the executor's claim, and presumably wiped that out.

As already said, complainants seek to charge the executor with the value of the corporate stock lost, the rental value of the premises during the seven years' occupancy by the corporation, as well as with the indebtedness from the corporation to the copartnership and the executor, respectively.

As to the rent, we think the master rightly charged the executor with one-third the rental value of the premises. It is true the testator's interest in the corporation was large, and there were perhaps adequate reasons for not earlier forcing the corporation into liquidation; but we fail to find that the executor could not, with entire safety to all interests, have enforced collection of a reasonable rental. We think the master's award in this respect should stand. It follows from our conclusion as to the validity of the sale of the Front street property that complainants were entitled to no accounting of rents after sale by the survivors. We think the conclusion that the rents of other partnership real estate had been sufficiently accounted for should not be disturbed.

[13] We are disposed to follow the concurrent action of the master and court which deny recovery on account of the partial loss of the copartnership debt. It does not appear at what time the partnership collections which the account represents were made by the corporation, and immediate liquidation may not have been long anticipated. We think, however, that the executor was not justified in making direct loans to the corporation without security. The corporation was without credit, having no capital beyond its stock in trade, and, from the first, money to operate the business had to be furnished through indorsement of its paper. The executor was not protected by the application of the Nodena account, for, as we have already held, the executor had no right to create that account, and the court's approval of the compromise afforded no protection because based on the executor's consent. The executor should be charged with the $3,000 loaned, plus the indebtedness to Hanauer at his death, which there was ample time to collect in the earlier years of operation, less the item of $1,303.73 before referred to.

The loss of capital stock presents other considerations. The concern was a close corporation. Its stock was not on the market. During the first year or so it appears to have succeeded, and we think the executors could not be charged with lack of care in failing to dispose of it during that period. We are impressed with the view that to have offered Hanauer's stock for sale after the business depression came on would have precipitated the corporation's collapse. While perhaps nothing has been gained by postponing liquidation, we cannot say that

the stock value was lost thereby. The executor should therefore not be charged with this loss.

*Brush Electric Light Company Stocks, Bonds, and Advances by Executors.* As shown by the inventory, Hanauer owned $13,500 stock and $1,000 bonds of this company. At the time of his death the company was insolvent, as shown by the testimony of its president, Carnes, and "at the end of their road." Hanauer and three other stockholders were indorsers upon notes of the company, which had also an outstanding series of bonds. Certain of the stockholders entered into a contract whereby the Brush Company's property should be conveyed to a new company free from debt, except the bond issue, and a new site furnished, stock in pro rata amount in the new company to be taken for that in the old; the old site to be turned over to the stockholders referred to. Hanauer was represented in this contract, and we are satisfied that it was made in his lifetime, and that he was personally a party to it. At his death this Electric Company stock seems to have been deposited with one Smith, in connection with that of other stockholders, to secure the agreement above stated. It also appeared in the inventory that the deposit was "for security on loans made by the company upon which he [Hanauer] was indorser with other stockholders." Carnes testified that the stockholders were to get no return for the moneys paid by them to discharge the debts; and, although he did not seem to remember the extent of the debts when the contract was made, yet, in view of his testimony that but for the contract the company must have gone into receivership, and inasmuch as he himself, although less interested than Hanauer, seems to have paid $6,600 on account of his liability, the debts must have been considerable. Between December 19, 1889, and October 6, 1890, the executors made the payments referred to in the summary of disbursements as "loans to Brush Electric Company, $19,369.76." These payments are challenged as unauthorized loans, and, even if justified, as chargeable to the executors because not collected back. All the advances in question appear in the probate court settlements, as well as on the executor's cashbook. We think it fairly inferable that all the items (unless to the extent of $5,000) were paid on account of Hanauer's original liability under either indorsements of paper or the contract with the new electric company referred to. The $5,000 mentioned seems to have been advanced in four equal installments to the new company, two expressly appearing to be for building new plant, one for "bldg. under contract," and one as "advanced that company." The contract with the new company was not found, but it was Carnes' recollection that the new company was to build the new plant, and take payment therefor in bonds at 85 cents. The old site is said to have been taken by the selling stockholders from the old electric company "for so much money * * * toward the liquidation of outstanding indebtedness." The executors' inventory included 20 shares Memphis Gas Light Company stock, $2,000. No Memphis Gas Light Company bonds there appear. The estate is, however, given credit in the probate court settlements for $2,700 proceeds Electric Light Company bonds; $4,030 for proceeds of sale $6,500

bonds of Memphis Light & Power Company; $3,000 as proceeds of sales of $12,000 of stock in "Mfs. L. & P. Co." We are satisfied from the fuller indorsements in the executors' cashbook, and from testimony, that these items represented the sale at 25 cents on the dollar of the Memphis stock received in exchange for Brush Company stock, of $3,000 Memphis first mortgage bonds at 90, and $6,500 second mortgage bonds at 62 cents, that the prices so received were the fair market value, and that the stock and bonds so sold were those received by the executors in some way in connection with the dealings with the new company, including the exchange of Brush Company securities and claims, and probably advances for building new plant. Schoolfield sold his own stock at the same price and at the same time that Hanauer's was sold. No credit, however, appears on account of the $2,000 Memphis stock mentioned in the inventory, which does not seem to have been sold. The master found that at one time it had a market value of 42½ cents, but that the executors were not chargeable with failure to sell it. No charge was made against the executors on account of these various stocks, except to the extent to which the estate was found to have realized. Neither this action nor the credit given on account of the loans and advances were disturbed by the court. As it is not clearly shown that the wrong conclusion was reached by the court and master, we concur in the disposition made below.

*Cotton Company Matters.* This company had a capital stock of $1,-000,000, issued as fully paid; in fact but a small percentage had been paid in. Hanauer held $54,000 of the stock, and was its president at the time of his death. Its capital was procured by loans from banks in Memphis and in one or more other places, upon indorsement by more or less of the stockholders, by agreement between whom each of a large number agreed to share, as between themselves, certain fractions of the net loss or liability, Hanauer's share being 1-11. At the time of his death he seems to have been indorser on as much as $100,000 of this paper. The company was then solvent so far as shown by its books, but its stock was speculative and had no real market value, properly speaking; the stock value consisting largely of patent rights on delinting machinery, etc. The master found, and we think properly, that the company was in fact insolvent when Hanauer died. Within two years following Hanauer's death his executors advanced to or for the benefit of the company $31,000. Certain other stockholders also made large advances. Complainants seek to charge the executors with the loss of Hanauer's capital stock, which was never realized upon, as well as the $31,000 so advanced. The master and the court held the executors not liable for the stock; the master charged the executors with over $14,000 of the $31,000 advanced, the court overruling the master in this latter respect. We think it clear that the executors should not be charged with the stock. The question of the loans charged up by the master is not so clear, but we are disposed to agree with the court. The basis of charging the item of $3,500 to the executor is that the item is not on the cashbook and is not accounted for. As we construe the record, the item was never in fact credited to the executor. We understand, however, that the charge was not in fact

stricken out in the master's final restatement of the account. The reasons for both these last conclusions are stated in the margin.[5]

The basis on which the master charged the other items to the executors is that there is nothing to show that they were anything but straight loans, and that the executors did not claim otherwise. It is true that neither the cashbook nor the executors' reports show that these advances were on account of Hanauer's liability, but it must be remembered that the accounting was had after the parties having immediate knowledge were dead; and while the question is not free from difficulty, we are inclined to the view that the action of the master failed to give due credit to the prima facie effect of the probate court settlements. Schoolfield was a large stockholder, and Poston, as Hanauer's representative, also took part in the corporate affairs. Every reasonable effort seems to have been made to save the concern from ruin, but without success. A fire in 1894 consumed the plant, and, as it turned out, the company's debts were about $200,000 more than its assets. Several other stockholders lost heavily, at least one much more than the Hanauer estate, and several were rendered bankrupt or insolvent. We are disposed to think that these facts, in connection with the probate court settlements, raise a presumption that the advancements in question represented in substance, directly or indirectly, the fulfillment of the obligations so incurred by Hanauer and existing at his death; having in mind the probability that certain of the indorsers proved uncollectible in part at least. We think the record fairly justifies the inference that in making the advancements and carrying the stock until the company's failure the executors used their best business judgment, and took the course followed by prudent stockholders representing their own investments. Whether or not anything was saved by the course taken, we are satisfied nothing was lost by it.

It results from what has been said earlier in this opinion that complainants in the cross-bill have had the substantial equivalent of a separate and distinct accounting relative to the sums due them as legatees under the eighth item.

It is also urged that stocks and bonds in large amounts were sold by the executors at sums below their real value; that many of the securities sold should not have been sold at all, as not needed for the payment of debts and expenses, but should have been kept as permanent investments, for assignment to the beneficiaries under the sixth

[5] But one item of $3,500 was included in the $36,195.05 credited the executors in first annual settlement. R. 496, 1793. This one item ($3,500) was included in making up balance of $5,010.30, September 1, 1890. R. 497. It was on the cashbook (R. 137), and helped make up the balance of $4,999.42, September 2, 1890 (R. 143), which varies from the probate court balance only in including item of $10.88, September 2, 1890. Had there been included a second $3,500, the balance shown on probate court record and cashbook could not have thus harmonized. The court, therefore, correctly ordered the charge to the executors stricken out. This was not done as to the principal ($3,500). R. 1490. The reason given was that the item was already allowed in the cash balance. This we think is a mistake. The cash balance used in making up the master's special account was $1,160.40 (R. 988), which included but the one item of $3,500 actually paid, the resulting balance to be distributed, $153,759.90 (R. 988) being included in the master's restated account (R. 1488).

and eighth items, and that certain stocks, if to be sold at all, should have been sold earlier, when, it is urged, a higher price could have been obtained. In this connection it is insisted that the stocks were inventoried at par, and that the burden of sustaining sales below par is upon the executors. But this argument overlooks, not only the prima facie effect of the probate court settlements, but, we think, misconceives the basis of the inventory. This, it is true, contains the statement, "and the stocks and bonds herein inventoried are at their face value." But this could scarcely have been intended as an appraisal at such value, for not only was there no formal appraisement of any property in the inventory except a few hundred dollars worth of personal effects at testator's residence, but the inventory contained many stocks worth, and doubtless known to be worth, at the time much more than par, one stock actually selling at about six times its face, and, on the other hand, it included stocks at the time considered worthless or worth much less than par; for practically contemporaneously with the filing of the inventory a copy thereof was furnished to the representatives of the beneficiaries under the eighth item, containing the executors' notations on many of the stocks, such as "good," "worthless," "nominal," "quoted 50 cents," "good—110 bid," "probably about at 5 cents," "130–135," "600," etc.

[14] Again, section 3979 of Shannon's Code is invoked, which requires the executor "to make sale of the goods and chattels of the deceased to the highest bidder, on ten days' notice of the time and place of sale," as forbidding private sales. Whether the Supreme Court of Tennessee has construed this statute as including corporate stocks in the terms "goods and chattels" we are not advised; but we think it not controlling of the executors' discretion under the will in question, and inapplicable to an estate held under such trusts as exist here. More-over, upon the evidence in this record as to the value of the stocks sold, so far as given, there is reason to believe that the stocks brought a better price at private sale than could have been realized by an auction sale under the statute. We are satisfied that the great bulk of the sales of stocks and bonds were made at their fair market value, and all in the exercise of the discretion which a reasonably prudent and intelligent man would have used in the administration of his own affairs. This we conceive to be the applicable test. Mickel v. Brown, 63 Tenn. (4 Baxt.) 468.

Many of the stocks held by the testator were more or less speculative in character. Before ordinary administration could well be completed a commercial stringency began which continued with greater or less force for several years, and which presumably affected Memphis as much as the country generally, and perhaps in some ways more, on account of the depression of the cotton industry. These facts doubtless contributed materially to the losses and disappointments occasioned the estate, both in respect of realizing on investments and in the subjection to payment upon collateral liabilities. We have found nothing in the record which impugns the integrity and good faith of the executors in their dealings with the administration of the estate. We think it makes no difference that certain of the stocks may have been sold for purposes of payment to the beneficiaries under the sixth and eighth

items. Such sales may properly be regarded as made by the trustee and within the discretion vested by the will.

Without discussing each of a large number of individual items involved, we content ourselves with saying that we have carefully considered them all, and that, under the application of the rules stated in this opinion, the conclusions of the master and court should not be disturbed except in the instances to which we shall refer.

The contention that large sums shown by the executor's settlements and cashbook to have been realized, or which were stated by the master in his report to be chargeable to the executors, were not in fact so charged rests upon misapprehension of the master's accounts and schedules. It is enough to say that, as we understand these accounts and schedules, every item so charged the executors in their reports, or on the cashbook or allowed by the master, was so charged by that officer either by inclusion in the accounting which resulted in the cash balance of $1,160.40 against the executors, before referred to, or by addition to that cash balance through which the ultimate rights and liabilities of the parties were reached.

*Cotton Exchange Building Company Stock.* This stock had a par value of $500. There was testimony that it was worth 70 to 75 cents. The master held it not accounted for, and charged the executor $375 and interest. This action was excepted to on the ground that the stock was sold September 13, 1889, for $445, and erroneously accounted for as "cotton exchange membership." The exception was sustained, and we think erroneously. There was proof that the membership also had value, and if the stock was accounted for, the membership was not. Moreover, while in the copy of inventory furnished by the executor the stock bore the latter's notation "50 to 60 cents," the membership was minuted "sold $445.00" (no value being carried out in the original inventory). The order sustaining the exception should be reversed, and the master's action affirmed.

*Personal Property at the Kerr Avenue Homestead,* $842.15. We think the master and the court properly charged this item to the executor. It was the one class of inventoried property actually appraised. The executors apparently understood it had to be accounted for, and this result is not impeached by the alleged fact that it remained in the homestead and so was used by the beneficiaries under the sixth item. The fact that it was not specified in the bill cannot be held fatal. The master took the proof apparently without objection, and it would have been open to the court upon exception to amend the order to meet the proofs.

[15] It is urged that under sections 4012 and 4481 of Shannon's Code claims of resident creditors could be paid only within 2½ years, and claims of nonresident creditors only within 3½ years after letters testamentary are granted, and that the executors had no right to sell to meet claims not paid until after those dates, and were not entitled to credit for payments so delayed. But in the absence of proofs to the contrary, the presumption is that the delay beyond the statutory period was at the request of the executor. Alvis v. Oglesby, 87 Tenn. (3 Pickle) 172, 10 S. W. 313; Allen v. Shanks, 90 Tenn. (6 Pickle) 359, 16 S. W. 715. In this case the presumption is not only not overthrown,

but is confirmed. Section 4015, providing for payment to the state treasurer of unclaimed estates, has plainly no relation to the estate and will under consideration.

*Taxes and Insurance Paid for Residuary Legatees and Beneficiaries.* The payments are shown by the cashbook and by the settlements, except (as to the latter) a few payments made after the 1903 settlement. There is nothing to impeach the presumption afforded by the settlements, and we are satisfied that the payments were all in fact made as claimed. As to the advances for the legatees under the eighth item, it is immaterial that the executors, as distinguished from the trustees, were not concerned in the payment of taxes on lands belonging to the beneficiaries, for the record amply supports the inference that the payments were made with the knowledge and approval of these legatees, and were properly treated as advancements on account of their distributive shares of the estate.

The advancements made to Mrs. Hampson stand on a materially different footing only so far as they affect the question of encroachment on the corpus of the estate.

We see no merit in the suggestion that the question of equalization between beneficiaries was not referred to the master. It was necessarily involved in the accounting. Nor do we think there is force in the point that the executors had nothing to do with the equalization, but that this duty belonged to the trustees, in connection with the division of the residue after the payment of debts, etc.; for the executors were also the trustees and were acting in a double capacity. Adams v. Gleaves, 10 Lea (Tenn.) 367, 384; Porter v. Moores, 4 Heisk. (Tenn.) 16.

*Compensation to Executors and Attorney's Fees.* These allowances are criticized on several grounds. The contention that no allowance for services and expenses not rendered or incurred within two years after administration granted can validly be made the executors (Shannon's Code, § 4047) is disposed of by the construction put upon that statute as being directory merely. Willeford v. Watson, 12 Heisk. (Tenn.) 476; Murgitroyde v. Cleary, 16 Lea (Tenn.) 539, 546. The objection that the surviving partner is not entitled to compensation for settling the affairs of the copartnership is answered, and we think correctly, by the master, that it does not appear that any of the credits allowed Schoolfield, executor, were for services rendered with reference to the partnership assets until after the same had been turned over to the executors, and by them held and managed with the remaining assets of the estate.

[16] The proposition, assuming it to be correct, that the statute contemplates the fixing of the executors' compensation only at the end of administration is not controlling. The master found that the probate court had allowed compensation on the basis of 5 per cent. commission, and made his subsequent allowances at that rate. We think that, in view of the difficulties connected with the settlement of the estate, and the attention apparently given to it by the executors, the allowance made is not unreasonable. Our attention is called to nothing in the record which we think seriously impugns the reasonableness of the attorney's fees paid. It is perhaps not clear whether the compensation

allowed D. H. Poston's estate after his death was for services as executor merely or as attorney (see summary of receipts and disbursements printed in note to this opinion), but an executor acting as attorney may also recover compensation as such. Fulton v. Davidson, 3 Heisk. (Tenn.) 614, 643.

[17] We are satisfied to affirm the action of the master and court with respect to the allowances both as to executors' compensation and on account of attorney's fees.

The contention that the claims of Flora Loeb and Jacob Hanauer are barred by limitation rests upon the proposition that their rights of action accrued at the respective dates when these claimants reached the age of 21 years, viz., in 1889 and 1893, respectively. But in view of the fact that distribution was not to be had until completion of administration, if we have properly concluded that such completion was rightly delayed to the extent it was, and so as to protect the executors from liability therefor, we are unable to see why the claimants are not likewise protected against the barring of their claims for the residue after administration completed. Schoolfield died in 1905. The bill was filed in 1907. As late as 1903, as shown by the probate court settlements and cashbook, payments of taxes were made for the account of these beneficiaries, as well as amounts paid them in equalization of their shares to that date.

Complaint is made that there has been no accounting respecting firm assets. The record shows: That on April 1, 1889, the credits of the various partners, as appearing upon the firm books, were as follows: Schoolfield, $96,752.07; Hanauer, $97,859.13; Miller, $75,930.42. That between that date and June 3, 1896, the partners received such amounts as to leave the following credit balances: Schoolfield, $35,695.99; Hanauer, $37,770.98; Miller, $36,495.90. These three partnership accounts seem to have represented the entire assets of the firm. Whether the assets so represented included the Ferguson & Hampson account afterwards merged in the sale of Nodena Plantation is not clear.

The master reported the amount of cash received by the executor from the surviving partners and the amount of rents collected from partnership realty. He reported as still on hand and undisposed of two parcels of described real estate in Shelby county, Tenn., and that Miller had made such conveyance upon receipt of his interest in those lands as that Schoolfield and the Hanauer estate owned the parcels in equal shares. He also reported that the lands in which Hanauer's estate was interested in Alabama and Arkansas are so vaguely described that definite and clear report could not be made as to what had been sold and what parts, if any, remained; that a large part of the assets of the firm had been accounted for in various partial settlements by the executor with the probate court; that some of the firm's books could not be found; that he was unable to make any findings as to the assets that remained as shown by the firm ledger, nor to equalize the partners, so far as the Hanauer estate is concerned, and found that all the accounts shown on the trial balance taken from the firm's ledger are worthless, except what has been accounted for through the probate court.

There is no suggestion that the firm still owes any debts, nor have we been cited to any testimony throwing any light upon the accounting as between the partners, except as shown by what we have already stated. Taking into account the division of the proceeds of sale of the Front street store and the treatment of the Nodena Plantation matters, the partnership affairs have presumably been regarded as requiring no further settlement, except to the extent of adjusting the balances between partners upon the basis which this record permits, and of providing for the sale of the remaining assets, so far as necessary, to effect such distribution and adjustment. It seems proper that the decree should formally determine the equalization as shown by the account balances referred to, and provide, so far as necessary, for enforcing, against remaining assets, the balances mentioned, as well as all other recoveries on account of partnership matters.

Dudley T. Schoolfield, executor, complains that the decree does not direct that he recover against Mrs. Hampson's executor and the other complainants the amount found by the master's restated account to be owing by them. As we construe the record, the order of the court on the master's restated account has the effect of establishing the result of the accounting as between the parties. The cross-bill filed by the executor was dismissed as unnecessary, or, if necessary, as brought too late, being filed after the master's report upon the accounting. We think the decree should show the final state of the account and direct recovery accordingly, except that it should not invade the possession of assets under the jurisdiction of the probate court for the purpose of administration. Waterman v. Canal-Louisiana Bank, 215 U. S. 33, 30 Sup. Ct. 10, 54 L. Ed. 80; Eddy v. Eddy (C. C. A., 6th Cir.) 168 Fed. 590, 93 C. C. A. 586. What the balance in favor of either party may be depends upon the restatement of the account under the rules we have laid down in this opinion. In determining rights as between defendants and Mrs. Hampson's children, the ultimate beneficiaries under the sixth item, we think the latter entitled to recover the amount of encroachments (if such shall prove to have been created) upon the principal of the estate otherwise apportionable to the children in question, and resulting from payments to Mrs. Hampson of funds chargeable only to income. We do not think the case is brought within the rule invoked that where the will evidences an intent to provide an income sufficient for the support of the beneficiaries, the principal may be encroached upon in case the income is palpably insufficient for such support. Lenow v. Arrington, 111 Tenn. 720, 723, 69 S. W. 314. Assuming (but not deciding) that the will contemplated encroachments upon the principal where necessary for support, and assuming that Mrs. Hampson had no income from the real estate belonging to her or to the trust estate (except the use of the Kerr avenue homestead), we cannot say that she needed to encroach upon the principal of the trust. In the seven years between testator's death and the failure of the Schoolfield-Hanauer Company about $18,000 of her individual personal estate, as well as about $5,000 representing claimed income from her net interest in the testator's estate, were applied upon her account with the Schoolfield-Hanauer Company (and thus in effect applied to the support of herself and children), to say nothing of the large balance

on account left standing against her. Of course, no encroachments could result from conveyances to the trustee, under the sixth item, of Nodena Plantation, the Kerr avenue homestead, the real estate allotted under partition proceedings, or from the application of Mrs. Hampson's property, held independently of the will, upon the Schoolfield-Hanauer account or otherwise.

It appearing that Miller's administrator received no assets and understands that the estate has none, complainants were not prejudiced, as the record now stands, by the dismissal of the bill as to the administrator.

The master relieved the executor and trustee from interest on funds of the estate in his hands from time to time and in bank at his death; as to the first, because very little was on hand at a time, and the account was active; as to the latter, because complainant could have had a successor trustee appointed without delay. We are content to approve this course as to the balances shown by the executor's accounts, as in his hands, without, however, affecting the subject of interest upon special items otherwise directed by this opinion.

To discuss each of the large number of propositions presented by counsel would unwarrantably extend this opinion. We have, however, considered them all, and have omitted reference to none involving, as we think, prejudicial error.

The decree of the district court is affirmed as concerns John H. Wade & Sons' title to the Front Street lot and Edith Brooks Schoolfield's title to the Townsend land, with costs of this court in favor of those appellees, as well as Mr. and Mrs. Norfleet, against complainants and cross-complainants. In other respects the decree should be modified to the extent only we have indicated.

The record will be remanded to the district court, with directions to take further proceedings not inconsistent with this opinion.

Complainants and cross-complainants will recover the costs of this court against appellees other than Wade & Sons, Edith Brooks Schoolfield, and Mr. and Mrs. Norfleet.

## On Petitions for Rehearing.

Rehearing is asked by Dudley T. Schoolfield and Mrs. Norfleet, and by John H. Poston and Mrs. Hill as sureties on the executor's bond. One point, perhaps, requires specific mention. By our opinion, Mr. Schoolfield was allowed credit on the accounting for $4,796.24, with interest thereon, as his share of the foreclosure sale price of Nodena Plantation. We are asked to determine definitely the interests of Mr. Schoolfield and Mrs. Norfleet in the plantation, and to declare each of those parties entitled to a share of the property and to an accounting for profits. Our opinion, at least impliedly, determines Mr. Schoolfield's rights as limited to the accounting credit stated. To this we adhere.

Even were we to disregard his failure to claim in this suit an interest in the plantation, except by cross-bill (which was dismissed by the court below) filed after the coming in of the commissioner's report under the order for accounting, we think the relief directed by our opin-

ion all he is entitled to, in view (if for no other reason) of the transaction evidenced by the conveyance by Schoolfield and Poston, trustees, to W. W. Schoolfield, trustee under the sixth item of the will, of all title and interest vested in the trustees under the commissioner's foreclosure deed, and W. W. Schoolfield's participation in such conveyance. Nor is it maintainable that the value of the testator's interest in the plantation was regarded as $70,815.02, instead of $35,407.51. The former figure is far in excess of the entire advances to the beneficiaries under the eighth item, as shown by the schedule of trustee's receipts and disbursements contained in our opinion; while the latter amount, added to the amounts advanced for Mrs. Hampson's account (aside from the so-called personal account representing the testator's liability to her), is but a few hundred dollars less than advanced to the beneficiaries under the eighth item.

The five years' rent of plantation, with interest, was intended to be applied, as the master applied his award on his account, for the benefit of both classes of beneficiaries, and not against the item of $21,114.60.

Mrs. Norfleet's claim was not considered by the court below, and she has not appealed. The decree was affirmed without prejudice to her rights. We cannot properly go further.

All the other points raised are covered by our decision. A careful consideration of the arguments advanced fails to convince us that the decision is wrong.

The petitions for rehearing are denied.